UNITED STATES *v.* JOHN ET AL.

No. 77–836.   Argued April 19, 1978—Decided June 23, 1978*

BLACKMUN, J., delivered the opinion for a unanimous Court.

*H. Bartow Farr III* argued the cause for the United States in No. 77–836.   With him on the brief were *Solicitor General McCree, Assistant Attorney General Moorman, Raymond N. Zagone, Carl Strass,* and *Larry G. Gutterridge.*

*Richard B. Collins* argued the cause for appellants in No. 77–575 and respondents in No. 77–836.   With him on the briefs was *Edwin R. Smith.*

---

*Together with No. 77–575, *John et al.* v. *Mississippi*, on appeal from the Supreme Court of Mississippi.

*Carl F. Andre* argued the cause for appellee in No. 77–575. With him on the brief were *A. F. Summer*, Attorney General of Mississippi, and *Catherine Walker Underwood*, Special Assistant Attorney General.†

Mr. Justice Blackmun delivered the opinion of the Court.

These cases present issues concerning state and federal jurisdiction over certain crimes committed on lands within the area designated as a reservation for the Choctaw Indians residing in central Mississippi. More precisely, the questions presented are whether the lands are "Indian country," as that phrase is defined in 18 U. S. C. § 1151 (1976 ed.) and as it was used in the Major Crimes Act of 1885, being § 9 of the Act of Mar. 3, 1885, 23 Stat. 385, later codified as 18 U. S. C. § 1153, and, if so, whether these federal statutes operate to preclude the exercise of state criminal jurisdiction over the offenses.

I

In October 1975, in the Southern District of Mississippi, Smith John [1] was indicted by a federal grand jury for assault with intent to kill Artis Jenkins, in violation of 18 U. S. C. §§ 1153 and 113 (a). [2] He was tried before a jury and, on

---

† *Harry R. Sachse* filed a brief for the Mississippi Band of Choctaw Indians as *amicus curiae* urging reversal in both cases. *Arthur Lazarus, Jr.*, filed a brief for the Association of Indian Affairs, Inc., as *amicus curiae* urging reversal in No. 77–836.

[1] Smith John's son, Harry Smith John, also was charged jointly with his father in the federal indictment. The United States and counsel for the Johns have advised the Court of Harry Smith John's death on February 18, 1978, and concede that as to him the case is moot. Brief for United States 3; Brief for John et al. 1. The brief for the State of Mississippi is silent as to this. We agree that both cases are moot as to Harry Smith John.

[2] At the time of the alleged offense, 18 U. S. C. § 1153 read:

"Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder,

December 15, was convicted of the lesser included offense of simple assault.[3]  A sentence of 90 days in a local jail-type institution and a fine of $300 were imposed.  On appeal, the United States Court of Appeals for the Fifth Circuit, considering the issue on its own motion, see App. to Pet. for Cert. in

---

manslaughter, rape, carnal knowledge of any female, not his wife, who has not attained the age of sixteen years, assault with intent to commit rape, incest, assault with intent to kill, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

"As used in this section, the offenses of rape and assault with intent to commit rape shall be defined in accordance with the laws of the State in which the offense was committed, and any Indian who commits the offenses of rape or assault with intent to commit rape upon any female Indian within the Indian country shall be imprisoned at the discretion of the court.

"As used in this section, the offenses of burglary, assault with a dangerous weapon, assault resulting in serious bodily injury, and incest shall be defined and punished in accordance with the laws of the State in which such offense was committed."

This section has since been amended by the Indian Crimes Act of 1976, 90 Stat. 585, which added kidnaping to the list of offenses covered and made changes, not pertinent to these cases, in the ways in which state law is incorporated.  Section 113, the statute specifying punishment for assaults committed within the special territorial jurisdiction of the United States, including those for which federal prosecutions are authorized by § 1153, was also amended by the same Act.  See H. R. Rep. No. 94–1038 (1976); S. Rep. No. 94–620 (1976).

[3] Under *Keeble* v. *United States,* 412 U. S. 205 (1973), Smith John was entitled to instructions regarding this lesser included offense.  It appears, however, see Brief for John et al. 5; Brief for United States 4, and n. 6, that Smith John argued before the Court of Appeals that although he was entitled to such instructions, the District Court had no jurisdiction to enter a judgment of conviction for the lesser offense, a misdemeanor not listed in § 1153.  The Court of Appeals, in deciding that the statute did not apply even to the extent urged by the United States, did not reach the issue.  It has not been argued before this Court.  See, however, *Felicia* v. *United States,* 495 F. 2d 353 (CA8), cert. denied, 419 U. S. 849 (1974).

No. 77–836, p. 39A, ruled that the District Court was without jurisdiction over the case because the lands designated as a reservation for the Choctaw Indians residing in Mississippi, and on which the offense took place, were not "Indian country," and that, therefore, § 1153 did not provide a basis for federal prosecution. 560 F. 2d 1202, 1205–1206 (1977). The United States sought review, and we granted its petition for certiorari in No. 77–836. 434 U. S. 1032 (1978).

In April 1976, Smith John [4] was indicted by a grand jury of Leake County, Miss., for aggravated assault upon the same Artis Jenkins, in violation of Miss. Code Ann. § 97–3–7 (2) (Supp. 1977). The incident that was the subject of the state indictment was the same as that to which the federal indictment related. A motion to dismiss the charge on the ground the federal jurisdiction was exclusive was denied. John was tried before a jury in the Circuit Court of Leake County and, in May 1976, was convicted of the offense charged. He was sentenced to two years in the state penitentiary. On appeal, the Supreme Court of Mississippi, relying on its earlier decision in *Tubby* v. *State,* 327 So. 2d 272 (1976), and on the decision of the United States Court of Appeals for the Fifth Circuit in *United States* v. *State Tax Comm'n,* 505 F. 2d 633 (1974), rehearing denied, 535 F. 2d 300, rehearing en banc denied, 541 F. 2d 469 (1976), held that the United States District Court had had no jurisdiction to prosecute Smith John, and that, therefore, his arguments against state-court jurisdiction were without merit. 347 So. 2d 959 (1977). Characterizing the case as one falling within this Court's jurisdiction under 28 U. S. C. § 1257 (2) (1976 ed.), Smith John filed notice of an appeal in No. 77–575. We

---

[4] Harry Smith John was also jointly charged with his father under the Mississippi indictment, and was convicted. As stated above, counsel for Harry Smith John concedes that the death of Harry Smith John on February 18, 1978, renders the state case moot as to him. Brief for John et al. 1.

postponed jurisdiction, 434 U. S. 1032 (1978). We now note jurisdiction. *Antoine* v. *Washington,* 420 U. S. 194 (1975); *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164 (1973).

## II

There is no dispute that Smith John is a Choctaw Indian, and it is presumed by all that he is a descendant of the Choctaws who for hundreds of years made their homes in what is now central Mississippi. The story of these Indians, and of their brethren who left Mississippi to settle in what is now the State of Oklahoma, has been told in the pages of the reports of this Court and of other federal courts. See, *e. g., Choctaw Nation* v. *Oklahoma,* 397 U. S. 620 (1970); *Winton* v. *Amos,* 255 U. S. 373 (1921); *Fleming* v. *McCurtain,* 215 U. S. 56 (1909); *United States* v. *Choctaw Nation,* 179 U. S. 494 (1900); *Choctaw Nation* v. *United States,* 119 U. S. 1 (1886); *Chitto* v. *United States,* 133 Ct. Cl. 643, 138 F. Supp. 253, cert. denied, 352 U. S. 841 (1956); *Choctaw Nation* v. *United States,* 81 Ct. Cl. 1, cert. denied, 296 U. S. 643 (1935).

At the time of the Revolutionary War, these Indians occupied large areas of what is now the State of Mississippi. In the years just after the formation of our country, they entered into a treaty of friendship with the United States. Treaty at Hopewell, 7 Stat. 21 (1786). But the United States became anxious to secure the lands the Indians occupied in order to allow for westward expansion. The Choctaws, in an attempt to avoid what proved to be their fate, entered into a series of treaties gradually relinquishing their claims to these lands.[5]

---

[5] Treaty at Fort Adams, 7 Stat. 66 (1801) (2½ million acres ceded); Treaty at Fort Confederation, 7 Stat. 73 (1802) (establishment of boundaries generally); Treaty at Hoe-Buckin-too-pa, 7 Stat. 80 (1803) (900,000 acres in conformity with the Fort Confederation agreement); Treaty at Mount Dexter, 7 Stat. 98 (1805) (4 million acres); Treaty at Fort St. Stephens, 7 Stat. 152 (1816) (ceding a relatively small tract where

Despite these concessions, when Mississippi became a State on December 10, 1817, the Choctaws still retained claims, recognized by the Federal Government, to more than three-quarters of the land within the State's boundaries. The popular pressure to make these lands available to non-Indian settlement, and the responsibility for these Indians felt by some in the Government, combined to shape a federal policy aimed at persuading the Choctaws to give up their lands in Mississippi completely and to remove to new lands in what for many years was known as the Indian Territory, now a part of Oklahoma and Arkansas. The first attempt to effectuate this policy, the Treaty at Doak's Stand, 7 Stat. 210 (1820), resulted in an exchange of more than 5 million acres. Because, however, of complications arising when it was discovered that much of the land promised the Indians already had been settled, most Choctaws remained in Mississippi. A delegation of Choctaws went to Washington, D. C., to untangle the situation and to negotiate yet another treaty. See 7 Stat. 234 (1825). Still, few Choctaws moved.

Only after the election of Andrew Jackson to the Presidency in 1828 did the federal efforts to persuade the Choctaws to leave Mississippi meet with some success.[6] Even before

---

Columbus, Miss., now stands). See A. DeRosier, Jr., The Removal of the Choctaw Indians 29 (1970).

[6] Andrew Jackson had been one of the two commissioners sent to negotiate the Treaty at Doak's Stand. From the land ceded by the Choctaws under that treaty, a new state capital, to be named Jackson, was planned. P. Fortune, The Formative Period, in 1 A History of Mississippi 255 (R. McLemore ed., 1973). Jackson's position with regard to the removal of the Indians played a significant role in his Presidential election and in his popularity in Mississippi. *Id.*, at 277. See generally DeRosier, *supra* n. 5, at 100–115; M. Young, Redskins, Ruffleshirts, and Rednecks: Indian Allotments in Alabama and Mississippi, 1830–1860, pp. 14–21 (1961); G. Foreman, Indian Removal: The Emigration of the Five Civilized Tribes of Indians 21 (1953 ed.); F. Cohen, Handbook of Federal Indian Law 56–59 (1941); Prucha, Andrew Jackson's Indian Policy: A Reassessment, 56 J. of Am. Hist. 527 (1969).

Jackson himself had acted on behalf of the Federal Government, however, the State of Mississippi, grown impatient with federal policies, had taken steps to assert jurisdiction over the lands occupied by the Choctaws. In early 1829, legislation was enacted purporting to extend legal process into the Choctaw territory. 1824–1838 Miss. Gen. Laws 195 (Act of Feb. 4, 1829). In his first annual address to Congress on December 8, 1829, President Jackson made known his position on the Indian question and his support of immediate removal. S. Doc. No. 1, 21st Cong., 1st Sess., 15–16 (1829). Further encouraged, the Mississippi Legislature passed an Act purporting to abolish the Choctaw government and to impose a fine upon anyone assuming the role of chief. The Act also declared that the rights of white persons living within the State were to be enjoyed by the Indians, and that the laws of the State were to be in effect throughout the territory they occupied. 1824–1838 Miss. Gen. Laws 207 (Act of Jan. 19, 1830).

In Washington, Congress debated whether the States had power to assert such jurisdiction and whether such assertions were wise.[7] But the only message heard by the Choctaws in Mississippi was that the Federal Government no longer would stand between the States and the Indians. Appreciating these realities, the Choctaws again agreed to deal with the Federal Government. On September 27, 1830, the Treaty at Dancing

---

[7] See, e. g., 6 Cong. Deb. 585 (1830). These debates culminated on May 28, 1830, in the passage of the Indian Removal Bill. 4 Stat. 411. See generally A. Abel, The History of Events Resulting in Indian Consolidation West of the Mississippi River, in 1906 Annual Report of the American Historical Assn. 377–382 (1908). They also set the stage for the constitutional crisis surrounding this Court's decision in *Worcester* v. *Georgia,* 6 Pet. 515 (1832), that the States had no power over the Indians and the Indian lands within their boundaries. See generally Burke, The Cherokee Cases: A Study in Law, Politics, and Morality, 21 Stan. L. Rev. 500 (1969); Miles, After John Marshall's Decision: *Worcester* v. *Georgia* and the Nullification Crisis, 39 J. of So. Hist. 519 (1973).

Rabbit Creek, 7 Stat. 333, was signed.[8]  It provided that the Choctaws would cede to the United States all lands still occupied by them east of the Mississippi, more than 10 million acres.  They were to remove to lands west of the river, where they would remain perpetually free of federal or state control, by the fall of 1833.  The Government would help plan and pay for this move.  Each Choctaw "head of a family being desirous to remain and become a citizen of the States," *id.*, at 335, however, was to be permitted to do so by signifying his intention within six months to the federal agent assigned to the area.  Lands were to be reserved, at least 640 acres per household, to be held by the Indians in fee simple if they would remain upon the lands for five years.  *Ibid.*  Other lands were reserved to the various chiefs and to others already residing on improved lands.  *Id.*, at 335–336.  Those who remained, however, were not to "lose the priviledge of a Choctaw citizen," *id.*, at 335, although they were to receive no share of the annuity provided for those who chose to remove.

The relations between the Federal Government and the Choctaws remaining in Mississippi did not end with the formal ratification of the Treaty at Dancing Rabbit Creek by the United States Senate in February 1831.  7 Cong. Deb. 347 (1831).  The account of the federal. attempts to satisfy

---

[8] Perhaps the best evidence of the circumstances surrounding this treaty lies in its very words.  As signed by the Choctaws, it contained the following preamble:

"Whereas the General Assembly of the State of Mississippi has extended the laws of said State to persons and property within the chartered limits of the [Choctaw lands], and the President of the United States has said that he cannot protect the Choctaw people from the operation of these laws; Now therefore that the Choctaw may live under their own laws in peace with the United States and the State of Mississippi they have determined to sell their lands east of the Mississippi and have accordingly agreed to the following articles of treaty."

The preamble was stricken from the treaty as ratified by the Senate.  7 Cong. Deb. 346–347 (1831).

642

the obligations of the United States both to those who
remained,[9] and to those who removed,[10] is one best left to
historians.   It is enough to say here that the failure of these

[9] See generally *Chitto* v. *United States*, 133 Ct. Cl. 643, 138 F. Supp.
253, cert. denied, 352 U. S. 841 (1956); Young, *supra* n. 6, at 47–72;
Riley, Choctaw Land Claims, 8 Publications of the Mississippi Historical
Society 345 (1904).

It is generally acknowledged that, whether anxious to conceal the fact that
far more Choctaws had remained in Mississippi than he had anticipated
originally, or simply because he was disinterested in his job and generally
dissolute, the agent in charge of the task refused to record the claims
of those who elected to remain.  See, *e. g., Coleman* v. *Doe,* 12 Miss.
40 (1844); *Chitto* v. *United States,* 133 Ct. Cl., at 648–649, 138 F.
Supp., at 257.  Speculators soon began pressing the cause of those who had
been refused.  Perhaps in large part due to their efforts, and the cloud
created on the ceded lands as they were put up for sale without the proper
recordation of Indian claims, Congress soon authorized investigation of the
situation.  See 7 American State Papers, Public Lands 448–525 (1860);
H. R. Rep. No. 663, 24th Cong., 1st Sess. (1836).

Although one might wonder whether it was concern for the preservation
of the claims for the Indians, or simply concern for the preservation of
the claims, that motivated subsequent events, measures were taken to
remedy the situation and to provide substitute lands for the Choctaws to
replace those lands sold despite their attempt to file claims.  One measure
provided that the claimants would be issued scrip enabling them to claim
substitute lands, but half the scrip was not to be delivered unless the
claimants removed to territory west of the Mississippi.  Act of Aug. 23,
1842, 5 Stat. 513.

The administration of this statute was as unsuccessful as had been the
administration of the original treaty.  It appears that in practice, none of
the scrip was delivered before removal, *Chitto* v. *United States,* 133 Ct.
Cl., at 649, 138 F. Supp., at 257, and that Congress later established a fund
to be paid in lieu of part of the scrip.  5 Stat. 777 (1845).  After an
attempt at settlement in 1852 proved unsuccessful, the United States and
the Choctaws in Oklahoma in 1855 entered into still another treaty that
provided that the Senate would make a determination of the amounts
owing to the Choctaws generally for the failure of the United States to
abide by its various treaty promises.  Treaty of June 22, 1855, 11 Stat.
611.  In March 1859, the Senate approved the general formula under which

attempts, characterized by incompetence, if not corruption, proved an embarrassment and an intractable problem for the Federal Government for at least a century. See, *e. g., Chitto v. United States,* 133 Ct. Cl. 643, 138 F. Supp. 253 (1956). It remained federal policy, however, to try to induce these Indians to leave Mississippi.

During the 1890's, the Federal Government became acutely aware of the fact that not all the Choctaws had left Mississippi. At that time federal policy toward the Indians favored the allotment of tribal holdings, including the Choctaw holdings in the Indian Territory, in order to make way for Oklahoma's statehood. The inclusion of the Choctaws then residing in Mississippi in the distribution of these holdings proved among the largest obstacles encountered during the allotment effort.[11] But even during this era, when federal policy again

---

those amounts were to be calculated, Cong. Globe, 35th Cong., 2d Sess., 1691; S. Rep. No. 374, 35th Cong., 2d Sess. (1859), and the Secretary of the Interior, pursuant to this direction, computed the total to be almost $3 million. See H. R. Exec. Doc. No. 82, 36th Cong., 1st Sess. (1860), reprinted in H. R. Rep. No. 251, 45th Cong., 2d Sess., 12 (1878). The War Between the States interrupted the payment of this Senate award, and, after the war, the Choctaws found themselves forced to prove their claims once again, this time in the federal courts. See *Choctaw Nation v. United States,* 119 U. S. 1 (1886), rev'g 21 Ct. Cl. 59.

[10] See generally DeRosier, *supra* n. 5, at 129–167; Wright, The Removal of the Choctaws to the Indian Territory 1830–1833, 6 Chronicles of Oklahoma 103 (1928); A. Debo, The Rise and Fall of the Choctaw Republic 56 (2d ed. 1961); n. 9, *supra.*

[11] The potential right of the Choctaws who had not removed to participate in any general allotment of the Oklahoma lands was acknowledged in the treaty entered into by the United States and the Choctaws and Chickasaws at the close of the war. 14 Stat. 774 (1866). But a new series of frauds and speculation made implementation of this policy difficult when the allotment eventually took place. See the essentially contemporaneous account of these events provided in Wade, The Removal of the 397 (1904). In response to a flood of claims of those purporting to be Mississippi Choctaws to whom a portion of its holdings in Oklahoma should

supported the removal of the Mississippi Choctaws to join their brethren in the West, there was no doubt that there remained persons in Mississippi who were properly regarded both by the Congress and by the Executive Branch as Indians.

It was not until 1916 that this federal recognition of the presence of Indians in Mississippi was manifested by other than attempts to secure their removal. The appropriations for the Bureau of Indian Affairs in that year included an item (for $1,000) to enable the Secretary of the Interior "to investigate the condition of the Indians living in Mississippi" and to report to Congress "as to their need for additional land and school facilities." 39 Stat. 138. See H. R. Doc. No. 1464, 64th Cong., 2d Sess. (1916). In March 1917, hearings were held in Union, Miss., by the House Committee on Investigation of the Indian Service, again exploring the desirability of providing federal services for these Indians. The efforts resulted in an inclusion in the general appropriation for the Bureau of Indian Affairs in 1918. This appropriation, passed only after debate in the House, 56 Cong. Rec. 1136–1140 (1918), included funds for the establishment of an agency with a physician, for the maintenance of schools, and for the purchase of land and farm equipment.[12] Lands purchased

be distributed, the Choctaw Nation resisted attempts to include Mississippi Choctaws on its rolls. Between 1897 and 1907, when the Choctaw rolls were finally closed, repeated efforts were made by the Dawes Commission, and by Congress, to determine the appropriate criteria for enrollment of the Mississippi Choctaws, and their participation in the allotment. Again, any participation was conditioned on removal from Mississippi. See the complete account of these efforts in *Estate of Winton* v. *Amos*, 51 Ct. Cl. 284 (1916), rev'd in part and aff'd in part, 255 U. S. 373 (1921).

[12] 40 Stat. 573 (1918). See Hearings on Indian Appropriation Bill before a Subcommittee of the House Committee on Indian Affairs, 65th Cong., 2d Sess., 153, 175–176 (1918).

Shortly after this appropriation was made, Cato Sells, Commissioner of Indian Affairs, traveled to Mississippi to gain firsthand information about the Indians there. In his annual report, he observed:

"Practically all of the Mississippi Choctaws are full-bloods. Very few

through these appropriations were to be sold on contract to individuals in keeping with the general pattern of providing lands eventually to be held in fee by individual Indians, rather than held collectively. Further provisions for the Choctaws in Mississippi were made in similar appropriations in later years.[13]

In the 1930's, the federal Indian policy had shifted back toward the preservation of Indian communities generally. This shift led to the enactment of the Indian Reorganization Act of 1934, 48 Stat. 984, and the discontinuance of the allotment program. The Choctaws in Mississippi were among the many groups who, before the legislation was enacted, voted to support its passage. This vote was reported to Congress by the Bureau of Indian Affairs. See Hearings on S. 2755 and S. 3645 before the Senate Committee on Indian Affairs, 73d Cong., 2d Sess., pt. 2, p. 82 (1934); Hearings on H. R. 7902 before the House Committee on Indian Affairs, 73d Cong., 2d Sess., 423 (1934). On March 30, 1935, the Mississippi Choctaws voted, as anticipated by § 18 of the Act, 48 Stat. 988, 25 U. S. C. § 478 (1976 ed.), to accept the provisions of the

---

own their homes. They are almost entirely farm laborers or share croppers. They are industrious, honest, and necessarily frugal. Most of them barely exist, and some suffer from want of the necessaries of life and medical aid. In many of the homes visited by me there was conspicuous evidence of pitiable poverty. I discovered families with from three to five children, of proper age, not one of whom had spent a day of their life in school. With very few exceptions they indicated willingness to go to school, as did their parents to send them. Several young Choctaw boys and girls expressed an ardent desire for an education." Report of the Commissioner of Indian Affairs, in 2 Reports of the Department of the Interior, 1918, pp. 79-80 (1919).

[13] 41 Stat. 15 (1919); 41 Stat. 420 (1920); 41 Stat. 1236 (1921); 42 Stat. 570 (1922); 42 Stat. 1191 (1923); 43 Stat. 409 (1924); 43 Stat. 1149, 1155, 1159 (1925); 44 Stat. 461, 468, 472 (1926); 44 Stat. 941, 947, 951 (1927); 45 Stat. 206, 216, 220 (1928); 45 Stat. 1568, 1578, 1581 (1929); 46 Stat. 286, 299 (1930); 46 Stat. 1121, 1135 (1931); 47 Stat. 109 (1932).

Act. T. Haas, Ten Years of Tribal Government Under I. R. A. 17 (U. S. Indian Service, Tribal Relations Pamphlet No. 1 (1947)).

By this time, it had become obvious that the original method of land purchase authorized by the 1918 appropriations—by contract to a particular Indian purchaser—not only was inconsistent with the new federal policy of encouraging the preservation of Indian communities with commonly held lands, but also was not providing the Mississippi Choctaws with the benefits intended. See H. R. Rep. No. 194, 76th Cong., 1st Sess. (1939). In 1939, Congress passed an Act providing essentially that title to all the lands previously purchased for the Mississippi Choctaws would be "in the United States in trust for such Choctaw Indians of one-half or more Indian blood, resident in Mississippi, as shall be designated by the Secretary of the Interior." Ch. 235, 53 Stat. 851. In December 1944, the Assistant Secretary of the Department of the Interior officially proclaimed all the lands then purchased in aid of the Choctaws in Mississippi, totaling at that time more than 15,000 acres, to be a reservation. 9 Fed. Reg. 14907.[14]

In April 1945, again as anticipated by the Indian Reorganization Act, § 16, 48 Stat. 987, 25 U. S. C. § 476 (1976 ed.), the Mississippi Band of Choctaw Indians adopted a constitution and bylaws; these were duly approved by the appropriate federal authorities in May 1945.[15]

---

[14] By its language, the 1939 Act affected only those lands that were "not under contract for resale to Choctaw Indians, or on which existing contracts of resale may hereafter be canceled." The 1944 Proclamation of Reservation recited specifically that it was issued "by virtue of the authority contained in the act of June 21, 1939, and in section 7 of the act of June 18, 1934," and that no such acquired lands were covered by any outstanding contract "for the resale of any part thereof to any Choctaw or other Indian."

[15] This constitution has since been amended in response to the Indian Civil Rights Act of 1968, 25 U. S. C. § 1301 et seq. (1976 ed.).

With this historical sketch as background, we turn to the jurisdictional issues presented by Smith John's case.

## III

In order to determine whether there is *federal* jurisdiction over the offense with which Smith John was charged (alleged in the federal indictment to have been committed "on and within the Choctaw Indian Reservation and on land within the Indian country under the jurisdiction of the United States of America"), we first look to the terms of the statute upon which the United States relies, that is, the Major Crimes Act, 18 U. S. C. § 1153. This Act, as codified at the time of the alleged offense, provided: "Any Indian who commits . . . assault with intent to kill . . . within the Indian country, shall be subject to the same laws and penalties as all other persons committing any [such offense], within the exclusive jurisdiction of the United States." The definition of "Indian country" as used here and elsewhere in chapter 53 of Title 18 is provided in § 1151.[16] Both the Mississippi Supreme Court

---

[16] As originally enacted, the Major Crimes Act made no reference to "Indian country" but, instead, referred to any "reservation" within the States and the Territories. See n. 22, *infra.* The legislation retained this general form when it was re-enacted as § 328 of the Criminal Code of 1909, 35 Stat. 1151 (codified from 1926 to 1948 as 18 U. S. C. § 548), and amended, 47 Stat. 336 (1932) (adding incest to the list of crimes covered, deleting the reference to the Territories, and providing expressly that rights of way running through a reservation were to be included as part of the reservation).

In the 1948 revision of Title 18, however, the express reference to "reservation" was deleted in favor of the use of the term "Indian country," which was used in most of the other special statutes referring to Indians, and as defined in § 1151. See Reviser's Note, and n. 18, *infra.*

The Act has since been amended four times, 63 Stat. 94 (1949) (relating to the punishment for the crime of rape); 80 Stat. 1100 (1966) (adding carnal knowledge and assault with intent to rape); 82 Stat. 80 (1968) (adding assault resulting in serious bodily injury); 90 Stat. 585 (1976) (see n. 2, *supra*), but its form has not been changed substantially.

and the Court of Appeals concluded that the situs of the alleged offense did not constitute "Indian country," and that therefore § 1153 did not afford a basis for the prosecution of Smith John in federal court. We do not agree.

With certain exceptions not pertinent here, § 1151 includes within the term "Indian country" three categories of land. The first, with which we are here concerned,[17] is "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent." This language first appeared in the Code in 1948 as a part of the general revision of Title 18. The Reviser's Notes indicate that this definition was based on several decisions of this Court interpreting the term as it was used in various criminal statutes relating to Indians. In one of these cases, *United States* v. *McGowan,* 302 U. S. 535 (1938), the Court held that the Reno Indian Colony, consisting of 28.38 acres within the State of Nevada, purchased out of federal funds appropriated in 1917 and 1926 and occupied by several hundred Indians theretofore scattered throughout Nevada, was "Indian country" for the purposes of what was then 25 U. S. C. § 247. (the predecessor of 18 U. S. C. § 3618 (1976 ed.)), providing for the forfeiture of a vehicle used to transport intoxicants into the Indian country. The Court noted that the "fundamental consideration of both Congress and the Department of the Interior in establishing this colony has been the protection of a dependent people." 302 U. S., at 538. The principal test applied was drawn from

---

[17] The second category for inclusion within the definition of "Indian country" is "all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a State." The third category is "all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." Inasmuch as we find in the first category a sufficient basis for the exercise of federal jurisdiction in this case, we need not consider the second and third categories.

an earlier case, *United States* v. *Pelican*, 232 U. S. 442 (1914), and was whether the land in question "had been validly set apart for the use of the Indians as such, under the superintendence of the Government." *Id.*, at 449; 302 U. S., at 539.[18]

The Mississippi lands in question here were declared by Congress to be held in trust by the Federal Government for the benefit of the Mississippi Choctaw Indians who were at that time under federal supervision. There is no apparent reason why these lands, which had been purchased in previous years for the aid of those Indians, did not become a "reservation," at least for the purposes of federal criminal jurisdiction at that particular time. See *United States* v. *Celestine*, 215 U. S. 278, 285 (1909). But if there were any doubt about the matter in 1939 when, as hereinabove described, Congress declared that title to lands previously purchased for the Mississippi Choctaws would be held in trust, the situation was completely clarified by the proclamation in 1944 of a reservation and the subsequent approval of the constitution and bylaws adopted by the Mississippi Band.

The Court of Appeals and the Mississippi Supreme Court held, and the State now argues, that the 1944 proclamation had no effect because the Indian Reorganization Act of 1934 was not intended to apply to the Mississippi Choctaws. Assuming for the moment that authority for the proclamation

---

[18] Some earlier cases had suggested a more technical and limited definition of "Indian country." See, *e. g.*, *Bates* v. *Clark*, 95 U. S. 204 (1877). Throughout most of the 19th century, apparently the only statutory definition was that in § 1 of the Act of June 30, 1834, 4 Stat. 729. But this definition was dropped in the compilation of the Revised Statutes. See *Ex parte Crow Dog*, 109 U. S. 556 (1883). This Court was left with little choice but to continue to apply the principles established under the earlier statutory language and to develop them according to changing conditions. See, *e. g.*, *Donnelly* v. *United States*, 228 U. S. 243 (1913). It is the more expansive scope of the term that was incorporated in the 1948 revision of Title 18.

can be found only in the 1934 Act, we find this argument unpersuasive. The 1934 Act defined "Indians" not only as "all persons of Indian descent who are members of any recognized [in 1934] tribe now under Federal jurisdiction," and their descendants who then were residing on any Indian reservation, but also as "all other persons of one-half or more Indian blood." 48 Stat. 988, 25 U. S. C. § 479 (1976 ed.). There is no doubt that persons of this description lived in Mississippi, and were recognized as such by Congress and by the Department of the Interior, at the time the Act was passed.[19] The references to the Mississippi Choctaws in the legislative history of the Act, see *supra*, at 645–646, confirm our view that the Mississippi Choctaws were not to be excepted from the general operation of the 1934 Act.[20]

---

[19] A report completed just after the passage of the Act recounts:

"After all the years of living in and among both white and colored race, it is indeed surprising to find that approximately 85 percent of this group are full bloods. Their racial integrity is intact in spite of the absence of permanent holdings or any sort of community life. Many of the older Choctaws do not speak English." E. Groves, Notes on the Choctaw Indians, Feb. 20–Mar. 20, 1936, p. 1 (Bureau of Indian Affairs).

[20] The State of Mississippi makes much of a sentence contained in an unpublished memorandum dated August 31, 1936, of the Solicitor for the Department of the Interior. It reads: "They [the Indians remaining in Mississippi] cannot now be regarded as a tribe." See F. Cohen, Handbook of Federal Indian Law 273 (1941). A reading of the entire memorandum, however, convinces us that it supports the position of the United States in this case. The memorandum was concerned only with the proper description of the Indians in the deeds relating to lands purchased according to the provisions of the Indian Reorganization Act. At least one deed had been prepared designating the grantee as "the United States in trust for the Choctaw tribe of Mississippi." The memorandum recommended that, because the Indians could not be regarded as a tribe *at that time,* the deeds be written designating the grantee as "[t]he United States in trust for such Choctaw Indians of one-half or more Indian blood, resident in Mississippi, as shall be designated by the Secretary of the Interior, until such time as the Choctaw Indians of Mississippi shall be organized as an Indian tribe pursuant to the act of June 18, 1934 (48 Stat. 984) [the

## IV

Mississippi appears to concede, Brief for Appellee in No. 77–575, p. 44, that if § 1153 provides a basis for the prosecution of Smith John for the offense charged, the State has no similar jurisdiction. This concession, based on the assumption that § 1153 ordinarily is pre-emptive of state jurisdiction when it applies, seems to us to be correct.[21] It was a necessary premise of at least one of our earlier decisions. *Seymour* v. *Superintendent,* 368 U. S. 351 (1962). See also *Williams* v. *Lee,* 358 U. S. 217, 220, and n. 5 (1959); *Rice* v. *Olson,* 324 U. S. 786 (1945); *In re Carmen's Petition,* 165 F. Supp. 942 (ND Cal. 1958), aff'd *sub nom. Dickson* v. *Carmen,* 270 F. 2d 809 (CA9 1959), cert. denied, 361 U. S. 934 (1960).[22]

---

Indian Reorganization Act], and then in trust for such organized tribe." Surely this is evidence that although there was no legal entity known as "the Choctaw tribe of Mississippi," the Department of the Interior anticipated that a more formal legal entity, a tribe for the purposes of federal Indian law, soon would exist.

[21] We do not consider here the more disputed question whether § 1153 also was intended to pre-empt tribal jurisdiction. See *Oliphant* v. *Suquamish Indian Tribe,* 435 U. S. 191, 203–204, n. 14 (1978); *United States* v. *Wheeler,* 435 U. S. 313, 325 n. 22 (1978).

[22] There is much in the legislative history to support this view. The Major Crimes Act was approved on March 3, 1885, 23 Stat. 385, in part in response to the decision of this Court in *Ex parte Crow Dog,* 109 U. S. 556 (1883). See *United States* v. *Kagama,* 118 U. S. 375, 382–383 (1886). As originally proposed in the House, the bill provided that Indians committing the specified crimes "within any Territory of the United States, and either within or without an Indian reservation, shall be subject therefor to the laws of such Territory relating to said crimes," and, similarly, that Indians committing the same crimes "within the boundaries of any State of the United States, and either within or without an Indian reservation, shall be subject to the same laws . . . as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States." 16 Cong. Rec. 934 (1885).

It became apparent in conference on the bill that this language would have a far broader effect than originally intended, for the language proposed would "take away from State courts, whether there be a reservation in the

The State argues, however, that the Federal Government has no power to produce this result. It suggests that since 1830 the Choctaws residing in Mississippi have become fully assimilated into the political and social life of the State, and that the Federal Government long ago abandoned its supervisory authority over these Indians. Because of this abandonment, and the long lapse in the federal recognition of a tribal organization in Mississippi, the power given Congress "[t]o regulate Commerce . . . with the Indian Tribes," Const. Art. I, § 8, cl. 3, cannot provide a basis for federal jurisdiction. To recognize the Choctaws in Mississippi as Indians over whom special federal power may be exercised would be anomalous and arbitrary.[23]

We assume for purposes of argument, as does the United States, that there have been times when Mississippi's jurisdiction over the Choctaws and their lands went unchallenged. But, particularly in view of the elaborate history, recounted above, of relations between the Mississippi Choctaws and the United States, we do not agree that Congress and the Execu-

State or not" jurisdiction over the listed crimes when committed by an Indian. *Id.*, at 2385. The provision was then amended to read "all such Indians committing any of the above crimes . . . within the boundaries of any State of the United States, and within the limits of any Indian reservation," and was agreed to with this change.

[23] Mississippi has made no effort, either in this Court or in the courts below, to support this argument with evidence of the assimilation of the Choctaw Indians in Mississippi, or with a demonstration of the services provided for them. There is evidence that some educational services have been provided by the State. See J. Peterson, The Mississippi Band of Choctaw Indians: Their Recent History and Current Social Relations 84, and *passim* (Ph. D. dissertation, University of Georgia 1970); J. Jennings, V. Beggs, & A. Caldwell, A Study of the Social and Economic Condition of the Choctaw Indians in Mississippi in Relation to the Educational Program 4 (Bureau of Indian Affairs 1945); T. Taylor, The States and Their Indian Citizens 177 (1972). But the provision of state services to Indians would not prove that the Federal Government had relinquished its ability to provide for these Indians under its Article I power.

tive Branch have less power to deal with the affairs of the Mississippi Choctaws than with the affairs of other Indian groups. Neither the fact that the Choctaws in Mississippi are merely a remnant of a larger group of Indians, long ago removed from Mississippi, nor the fact that federal supervision over them has not been continuous, destroys the federal power to deal with them. *United States* v. *Wright,* 53 F. 2d 300 (CA4 1931), cert. denied, 285 U. S. 539 (1932).[24]

The State also argues that the Federal Government may not deal specially with the Indians within the State's boundaries because to do so would be inconsistent with the Treaty at Dancing Rabbit Creek. This argument may seem to be a cruel joke to those familiar with the history of the execution of that treaty, and of the treaties that renegotiated claims arising from it. See *supra,* at 640–643. And even if that treaty were the only source regarding the status of these Indians in federal law, we see nothing in it inconsistent with the continued federal supervision of them under the Commerce Clause. It is true that this treaty anticipated that each of those electing to remain in Mississippi would become "a citizen of the States," but the extension of citizenship status to Indans does not, in itself, end the powers given Congress to

---

[24] We need not be concerned, as Mississippi hints, that the assumption of federal criminal jurisdiction over the Choctaw Indians in Mississippi, if not historically anomalous, is inconsistent with the intent of Congress. In the early 1950's, when federal Indian policy again emphasized assimilation, a thorough survey was made of all the then recognized tribes and their economic and social conditions. These efforts led to a congressional resolution calling for the freedom of certain tribes from federal supervision "at the earliest possible time," 67 Stat. B 132 (1953), conferring on certain designated States jurisdiction with respect to criminal offenses and civil causes committed or arising on Indian reservations, and granting federal consent to the assertion of state jurisdiction by other States. *Id.,* at 588–590. The Mississippi Band of Choctaw Indians was among those for whom the Bureau of Indian Affairs recommended continued supervision. See H. R. Rep. No. 2680, 83d Cong., 2d Sess., 31–32, and *passim* (1954). See also H. R. Rep. No. 2503, 82d Cong., 2d Sess., 313 (1953).

deal with them.    See *United States* v. *Celestine*, 215 U. S. 278 (1909).

V

We therefore hold that § 1153 provides a proper basis for federal prosecution of the offense involved here, and that Mississippi has no power similarly to prosecute Smith John for that same offense.    Accordingly, the judgment of the Supreme Court of Mississippi in No. 77–575 is reversed; further, the judgment of the United States Court of Appeals for the Fifth Circuit in No. 77–836 is reversed, and that case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*