W. FLETCHER, Circuit Judge, with whom Judges PREGERSON, REINHARDT, PAEZ, and RAWLINSON
join, concurring:
I fully concur with Judge Graber’s majority opinion. However, I write separately because there is an easier and narrower ground for upholding Kamehameha Schools’ admissions policy.
*850 The question in this case is whether 42 U.S.C. § 1981 forbids Kamehameha Schools from giving Native Hawaiian applicants a conclusive preference for admission into its K-12 programs. In answering this question, the majority opinion assumes that “Native Hawaiian is a racial classification.” Op. at 837 n. 9. Based on this assumption, it holds that § 1981 permits private schools, in certain circumstances, to prefer disadvantaged minority groups — not limited to Native Hawaiians — based on race. But the case before us does not involve an admissions policy generally favoring disadvantaged minorities, or favoring specific racial or ethnic groups such as African-Americans or Hispanics. It involves only an admissions policy favoring “Native Hawaiians,” defined as persons “descended from the aboriginal people who exercised sovereignty in the Hawaiian Islands prior to 1778.” Op. at 832.
A narrower ground for sustaining Kamehameha Schools’ admissions policy is that “Native Hawaiian” is not merely a racial classification. It is also a political classification. I would divide the question in this case into two sub-questions. First, can Congress constitutionally provide special benefits, including educational benefits, to descendants of Native Hawaiians because “Native Hawaiian” is a political classification? Second, if the answer to this question is yes, has Congress done so in § 1981?
I. Constitutionality of Preference for Native Hawaiians
Because of their history, ably recounted in the majority opinion, Native Hawaiians constitute a unique population that has a “special trust relationship” with the United States. Congress has repeatedly “affirmed,” “acknowledged,” “reaffirmed,” and “recognized” that relationship. See 20 U.S.C. § 7512(8)-(13); 42 U.S.C. § 11701(13)-(16), (19)-(21); see also S. Joint Res. No. 19, Pub.L. No. 103-150, 107 Stat. 1510 (1993) (“Apology Resolution”). Based on this “historical and unique legal relationship,” Congress has enacted more than 150 laws that “extend to the Hawaiian people the same rights and privileges accorded to American Indian, Alaska Native, Eskimo, and Aleut communities.” 42 U.S.C. § 11701(19); see Rice v. Cayetano, 528 U.S. 495, 533, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) (Stevens, J., dissenting); see also Jon M. Van Dyke, The Political Status of the Native Hawaiian People, 17 Yale L. & Pol’y Rev. 95, 106 n. 67 (1998) (listing a sampling of statutes that provide separate benefit programs for Native Hawaiians or include them in benefit programs that assist other native people).
Congress has stated in support of such statutes that “the political status of Native Hawaiians is comparable to that of American Indians and Alaska Natives,” 20 U.S.C. § 7512(12)(D), and that “[t]he authority of Congress under the United States Constitution to legislate in matters affecting the aboriginal or indigenous peoples of the United States includes the authority to legislate in matters affecting the native peoples of Alaska and Hawaii.” 42 U.S.C. § 11701(17). Congress has emphasized that it “does not extend services to Native Hawaiians because of their race, but because of their unique status as indigenous people of a once sovereign nation as to whom the United States has established a trust relationship.” 20 U.S.C. § 7512(12)(B).
In Morton v. Mancari, 417 U.S. 535, 539, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), “non-Indian employees” of the Bureau of Indian Affairs challenged a hiring preference for American Indians as “invidious racial discrimination in violation of the *851 Due Process Clause of the Fifth Amendment.” The Court held that the tribal Indian classification is “political rather than racial in nature.” Id. at 554 n. 24, 94 S.Ct. 2474. Benefits were “granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities.” Id. at 554, 94 S.Ct. 2474. Citing the “special relationship” doctrine, the Court held that the tribal Indian classification did not trigger strict scrutiny.
The special relationship doctrine is based on an acknowledgment that the United States “ ‘overcame the Indians and took possession of their lands, sometimes by force, leaving them an uneducated, helpless and dependent people.’” Id. at 552, 94 S.Ct. 2474 (quoting Bd. of County Comm’rs v. Seber, 318 U.S. 705, 715, 63 S.Ct. 920, 87 L.Ed. 1094 (1943)); see also United States v. Kagama, 118 U.S. 375, 384, 6 S.Ct. 1109, 30 L.Ed. 228 (1886) (“From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power.”). The Court in Mancari noted that “[i]t is in this historical and legal context that the constitutional validity of the Indian preference is to be determined.” 417 U.S. at 553, 94 S.Ct. 2474. Since the preference “can be tied rationally to the fulfillment of Congress’ unique obligation toward the Indians,” the Court held that it does not violate the equal protection component of the Due Process Clause. Id. at 555, 94 S.Ct. 2474.
In other contexts, the Supreme Court has not insisted on continuous tribal membership, or tribal membership at all, as a justification for special treatment of Indians. In United States v. John, 437 U.S. 634, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978), decided after Mancari, the Court held that “Indian country,” as used in 18 U.S.C. § 1151, included the Choctaw Indian Reservation in Mississippi. The Court noted that for many years the Choctaw lands in Mississippi had not been reservation lands, and that some Choctaws may have been considered to be reservation Indians based on their having “one-half or more Indian blood” rather than on any tribal membership. Id. at 650, 98 S.Ct. 2541. The Court concluded, “Neither the fact that the Choctaws in Mississippi are merely a remnant of a larger group of Indians, long ago removed from Mississippi, nor the fact that federal supervision over them has not been continuous, destroys the federal power to deal with them.” Id. at 653, 98 S.Ct. 2541. In Delaware Tribal Business Committee v. Weeks, 430 U.S. 73, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977), also decided after Mancari, the Court upheld against a due process challenge a distribution of funds to both tribal and non-tribal Indians as “ ‘special treatment [that] can be tied rationally to the fulfillment of Congress’ unique obligation toward the Indians.’ ” Id. at 85, 97 S.Ct. 911 (quoting Mancari, 417 U.S. at 555, 94 S.Ct. 2474).
For its part, Congress has repeatedly provided special treatment, including distribution of funds, based on broad definitions of the terms “Indian,” “native,” “Native American,” and “tribal organization” that encompass Indians who are not members of federally recognized tribes. See, e.g., 25 U.S.C. § 479 (defining “Indian” to include “persons of one-half or more Indian blood” who are not also tribal members); id. § 500n (defining “natives of Alaska” as “native Indians, Eskimos, and Aleuts of whole or part blood inhabiting Alaska at the time of the Treaty of Cession of Alaska to the United States and their descendants of whole or part blood”); id. § 1603(c) (defining “Indian” to include “any individual who (1), irrespective of whether he or she lives on or near a reservation, is a member of a tribe, band, *852 or other organized group of Indians, including those tribes, bands, or groups terminated since 1940 and those recognized now or in the future by the State in which they reside, or who is a descendant, in the first or second degree, of any such member, or (2) is an Eskimo or Aleut or other Alaska Native, or (8) is considered by the Secretary of the Interior to be an Indian for any purpose”); id. § 1679(b)(2) (defining “Eligible Indians” to include members of non-federally recognized tribes so long as the person can demonstrate descent from an Indian resident in California as of 1852); id. § 2902(1) (defining “Native American” as “an Indian, Native Hawaiian, or Native American Pacific Islander”); 38 U.S.C. § 3765(4) (defining “tribal organization” to include “the Department of Hawaiian Homelands, in the case of native Hawaiians, and such other organizations as the Secretary may prescribe”); 42 U.S.C. § 3002(20) (defining “Native American” as a member of an Indian tribe or a Native Hawaiian); 43 U.S.C. § 1602(b) (defining “Native” as “a person of one-fourth degree or more Alaska Indian (including Tsimshian Indians not enrolled in the Metlaktla Indian Community) Eskimo, or Aleut blood, or combination thereof’).
We observe “the time-honored presumption” that the passage of the many federal statutes benefitting Native Hawaiians, Alaska Natives, and American Indians “is a ‘constitutional exercise of legislative power.’” Reno v. Condon, 528 U.S. 141, 148, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000) (quoting Close v. Glenwood Cemetery, 107 U.S. 466, 475, 2 S.Ct. 267, 27 L.Ed. 408 (1883)). The basis for this exercise of power is Congress’ conclusion that “Native Hawaiian,” like “Alaska Native” and “Indian,” is a political classification subject to the special relationship doctrine. Unless we were to hold that Congress cannot legislate for the special benefit of Native Hawaiians, thereby striking down the enormous swaths of the United States Code enacted pursuant to the special relationship doctrine, we must conclude that the doctrine permits Congress to provide special benefits to Native Hawaiians.
I recognize that the Court has struck down a statute granting preferential voting rights to Native Hawaiians, but voting rights are sui generis. In Rice v. Cayetano, 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000), the Supreme Court addressed a provision of the Hawaiian Constitution limiting to “Hawaiians” the right to vote in a certain statewide election. The term “Hawaiians” was generally defined as descendants of people inhabiting the Hawaiian Islands in 1778. Id. at 499, 509, 120 S.Ct. 1044. The Court held that under the Fifteenth Amendment “Congress may not authorize a State to create a voting scheme of this sort.” Id. at 519, 120 S.Ct. 1044. In so holding, the Court assumed “authority in Congress, delegated to the State, to treat Hawaiians or native Hawaiians as tribes,” id., but it refused to extend the special relationship doctrine to the “new and larger dimension” of voting restrictions in state elections. Id. at 520, 120 S.Ct. 1044.
The Court in Rice was careful to confine its analysis to voting rights under the Fifteenth Amendment. It cautioned that 19094 “[t]he validity of the voting restriction is the only question before us.” Id. at 521, 120 S.Ct. 1044. Emphasizing the importance and unique character of voting rights under the Fifteenth Amendment, the Court wrote, “the Amendment is cast in fundamental terms, terms transcending the particular controversy which was the immediate impetus for its enactment.” Id. at 512, 120 S.Ct. 1044. Further, “use of racial classifications is corruptive of the whole legal order democratic elections seek to preserve.” Id. at 517, 120 S.Ct. 1044; see also Shaw v. Reno, 509 U.S. 630, *853 657, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (“Racial classifications with respect to voting carry particular dangers.”).
Unlike Rice, the case before us does not involve preferential voting rights subject to challenge under the Fifteenth Amendment. Rather, it involves the preferential provision of educational benefits. To the extent that the federal Constitution is implicated at all, the relevant text is the Equal Protection Clause of the Fourteenth Amendment. The Court in Rice never questioned the validity of the special relationship doctrine under the Fourteenth Amendment, and never even hinted that its Fifteenth Amendment analysis would apply to the many benefit programs enacted by Congress for Native Hawaiians, Alaska Natives, and American Indians.
I therefore conclude that Congress may, if it wishes, permit Kamehameha Schools to give preferential admissions treatment to Native Hawaiians. The remaining question is whether Congress has in fact done so under § 1981.
II. Section 1981
When Congress enacted § 1981 in the Civil Rights Act of 1866, Act of Apr. 9, 1866, ch. 31, § 1, 14 Stat. 27, and reenacted it four years later in the Enforcement Act of 1870, Act of May 31, 1870, ch. 114, §§ 16, 18, 16 Stat. 144, the Hawaiian Islands were still a sovereign kingdom whose people were not “within the jurisdiction of the United States.”[1] As stated by Congress, “from 1826 until 1893, the United States recognized the independence of the Kingdom of Hawaii, extended full and complete diplomatic recognition to the Hawaiian Government, and entered into treaties and conventions with the Hawaiian monarchs to govern commerce and navigation in 1826, 1842, 1849, 1875, and 1887.” Apology Resolution, Pub.L. No. 103-150, 107 Stat. at 1510.
For many years after the Hawaiian Kingdom was over-thrown in 1893, and even after the State of Hawaii was admitted to the Union in 1959, § 1981 posed no threat to Kamehameha Schools’ preferential admissions policy. But in 1976 the Supreme Court held that § 1981 reaches both (1) admissions programs at private schools that categorically exclude African-Americans, Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), and (2) racial discrimination in private employment against whites as well as nonwhites, McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Together, these cases intimated that § 1981 might prohibit private school admissions policies that exclude whites.
In 1991, Congress revised and reenacted § 1981. See Civil Rights Act of 1991, Pub.L. No. 102-166, § 101, 105 Stat. 1071, 1071-72. By this time, Congress had enacted numerous statutes that provided exclusive benefit programs for Native Hawaiians or included them in benefit programs for other native peoples. Indeed, just a few years before reenacting § 1981, Congress passed many laws that gave exclusive contractual or grant benefits to Native Hawaiians and Native Hawaiian organizations.[2] Congress pro *854 claimed that its Native Hawaiian benefit programs are “consistent with the historical and unique legal relationship of the United States with the government that represented the indigenous native people of Hawaii,” Native Hawaiian Health Care Act of 1988, Pub.L. No. 100-579, § 2(2), 102 Stat. at 2916 (codified as amended at 42 U.S.C. § 11701), and that this relationship gives Congress “the power to specially legislate for the benefit of Native Hawaiians.” Hawkins-Stafford Amendments, Pub.L. No. 100-297, tit. IV, § 4001(2), 102 Stat. at 358 (formerly codified at 20 U.S.C. § 4901(2)) (repealed 1994).
When Congress reenacted § 1981, two recently passed laws directed Kamehameha Schools — by name — to provide educational benefits to Native Hawaiians, and only Native Hawaiians. The Hawkins-Stafford Amendments, passed in 1988, instructed the Secretary of Education to “make grants to the Kamehameha Schools/Bernice Pauahi Bishop Estate for a demonstration program to provide Higher Education fellowship assistance to Native Hawaiian students.” Id. § 4005(a), 102 Stat. at 360. One year before reenacting § 1981, Congress amended the Public Health Service Act to direct the Secretary to “provide funds to Kamehameha Schools/Bishop Estate for the purpose of providing scholarship assistance” to eligible Native Hawaiian students. Act of Nov. 29, 1990, Pub.L. No. 101-644, § 401, 104 Stat. 4662, 4668 (codified as amended at 42 U.S.C. § 254s). These federal statutes specifically directed Kamehameha Schools to do precisely what plaintiffs in this case say is forbidden by § 1981.
It was not until the 1991 amendments to § 1981 that Congress specified that it intends courts to apply the statute to substantive discrimination by private actors. See 42 U.S.C. § 1981(c) (“The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.”). In order to hold for plaintiff in this case, we would have to conclude that Congress intended this provision to invalidate, sub silentio, the recently enacted legislation that provided loans and scholarships exclusively to Native Hawaiians at Kamehameha Schools. But this conclusion would require us to turn our back on the Supreme Court’s analysis in Mancari, where it rejected the challenge *855 of non-Indian plaintiffs to Indian employment preferences as inconsistent with the federal Equal Employment Opportunity Act of 1972.
The Mancari plaintiffs argued that
since the [Equal Employment Opportunity Act of 1972] proscribed racial discrimination in Government employment, the Act necessarily, albeit sub silentio, repealed the provision of the [Indian Reorganization Act of 1934] that called for the preference in the [Bureau of Indian Affairs] of one racial group, Indians, over non-Indians.
Mancari, 417 U.S. at 547, 94 S.Ct. 2474. The 1972 Act, upon which the Mancari plaintiffs relied, amended Title VII of the Civil Rights Act of 1964. Id. at 546-47, 94 S.Ct. 2474. Whereas the 1964 Civil Rights Act had expressly exempted certain Indian preferences, neither the text nor the legislative history of the amending 1972 Act made any reference to such preferences. Id. Given that the 1972 Act was specifically modeled on the 1964 Act, the omission of an exemption for Indian preferences was especially glaring, and the plaintiffs’ argument for sub silentio repeal especially strong.
Nevertheless, the Supreme Court unanimously and emphatically rejected the argument for sub silentio repeal by the 1972 Amendment:
It toould be anomalous to conclude that Congress intended to eliminate the longstanding statutory preferences in BIA employment, as being racially discriminatory, at the very same time it was reaffirming the right of tribal and reservation-related private employers to provide Indian preference. Appellees’ assertion that Congress implicitly repealed the preference as racially discriminatory, while retaining the 1964 preferences, attributes to Congress irrationality and arbitrariness, an attribution we do not share.
... Three months after Congress passed the 1972 amendments, it enacted two neiv Indian preference latos.... It is improbable, to say the least, that the same Congress which affirmatively approved and enacted these additional and similar Indian preferences was, at the same time, condemning the BIA preference as racially discriminatory. In the total absence of any manifestation of supportive intent, we are loathe to imply this improbable result.
This is a prototypical case where an adjudication of repeal by implication is not appropriate. The preference is a longstanding, important component of the Government’s Indian program. The anti-discrimination provision, aimed at alleviating minority discrimination in employment, obviously is designed to deal with an entirely different and, indeed, opposite problem. Any perceived conflict is thus more apparent than real. ... A provision aimed at furthering Indian self-government by according an employment preference within the BIA for qualified members of the governed group can readily co-exist with a general rule prohibiting employment discrimination on the basis of race. Any other conclusion can be reached only by formalistic reasoning that ignores both the history and purposes of the preference and the unique legal relationship be-tiveen the Federal Government and tribal Indians.
Furthermore, the Indian preference statute is a specific provision applying to a very specific situation. The 1972 Act, on the other hand, is of general application. Where there is no clear intention otherwise, a specific statute will not be *856 controlled or nullified by a general one, regardless of the priority of enactment.
The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.
Id. at 548-51, 94 S.Ct. 2474 (emphasis added) (citations omitted).
The principal dissent insists that the failure of § 1981 to include in its text an explicit exception for Native Hawaiians is fatal to Kamehameha Schools’ admissions policy. But of all the federal statutes to which strict text-based rules of statutory construction might be applied, § 1981 is a particularly inappropriate candidate. The text of § 1981 only guarantees “the same right ... to make and enforce contracts ... as is enjoyed by white citizens.” 42 U.S.C. § 1981(a). It does not guarantee the converse — the right of white persons or citizens to enjoy the same contractual rights as non-whites. Therefore, according to the dissent’s interpretive method, § 1981 should not be read to protect whites against private racial discrimination. But we know that, despite the clear text of § 1981, this conclusion would be wrong, for the Supreme Court held in 1976 that whites as well as non-whites are protected under § 1981. McDonald, 427 U.S. at 286-87, 96 S.Ct. 2574.
Congress’ provision of educational benefits to Native Hawaiians continues to this day. Congress repealed the Native Hawaiian provisions of the Hawkins-Stafford Amendments only to replace them with the more comprehensive Native Hawaiian Education Act (“NHEA”), Pub.L. No. 103— 382, §§ 9201 et seq., 108 Stat. 3794 (1994) (formerly codified at 20 U.S.C. §§ 7901 et seq.) (repealed 2002), which Congress later reenacted in the No Child Left Behind Act of 2001. 20 U.S.C. §§ 7511 et seq. As part of the No Child Left Behind Act of 2001, a congressional committee exhorted the Bishop Trust, which finances Kamehameha Schools, to “redouble its efforts to educate Native Hawaiian children.” H.R.Rep. No. 107-63(1), at 333.
The NHEA continues to allocate money to private non-profit organizations to provide programs for the exclusive benefit of Native Hawaiians. See 20 U.S.C. § 7515. Kamehameha Schools’ definition of “Native Hawaiian” is virtually identical to that used in the NHEA. See 20 U.S.C. § 7517(1)(B) (defining “Native Hawaiian” as “a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now comprises the State of Hawaii”). The NHEA expressly declares that “Congress does not extend services to Native Hawaiians because of their race, but because of their unique status as the indigenous people of a once sovereign nation as to whom the United States has established a trust relationship.” 20 U.S.C. § 7512(12)(B).
Through the NHEA and the myriad other federal statutes that confer benefits on Native Hawaiians, Congress has made manifest its intent to apply some form of the special relationship doctrine to Native Hawaiians. The well established general rule is that less — not more — demanding scrutiny applies to private discrimination than to government-sponsored discrimination. It would be deeply ironic for us to hold that § 1981 forbids private institutions from giving Native Hawaiians educational benefits when, at the same time, Congress itself provides such benefits and provides public funds for private organizations to do the same.
Conclusion
Congress has invariably treated “Native Hawaiian” as a political classification for *857 purposes of providing exclusive educational and other benefits. Under the special relationship doctrine, Congress has the power to do so. I see nothing in § 1981 to indicate that Congress intended to impose upon private institutions a more restrictive standard for the provision of benefits to Native Hawaiians than it has imposed upon itself.

. The 1866 statute used slightly different language, but to the same effect: the statute applied to "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed.” 14 Stat. 27.

. See, e.g., Native American Programs Act Amendments of 1987, Pub.L. No. 100-175, § 506, 101 Stat. 973, 976-78 (establishing "Revolving Loan Fund for Native Hawaiians” to promote economic and social self-sufficiency of Native Hawaiians); Jacob K. Javits Gifted and Talented Students Education Act of 1988, Pub.L. No. 100-297, tit. I, § 4104, 102 Stat. 237, 238 (authorizing grants or con *854 tracts with institutions (including Indian tribes and Native Hawaiian organizations) to carry out programs or projects designed to meet the educational needs of gifted and talented children); Drug-Free Schools and Communities Act of 1986, Pub.L. No. 100-297, tit. I, § 5134, 102 Stat. 252, 261 (1988) (authorizing education grants, cooperative agreements, or contracts with organizations that primarily serve and represent Native Hawaiians); Augustus F. Hawkins-Robert T. Stafford Elementary and Secondary School Improvement Amendments of 1988 ("Hawkins-Stafford Amendments”), Pub.L. No. 100-297, tit. IV, §§ 4001 et seq. ("Education for Native Hawaiians”), 102 Stat. 130, 358-63 (repealed 1994) (authorizing and developing supplemental educational programs to benefit Native Hawaiians); Native Hawaiian Health Care Act of 1988, Pub.L. No. 100-579, 102 Stat. 2916 (authorizing programs to improve the health status of Native Hawaiians); Handicapped Programs Technical Amendments Act of 1988, Pub.L. No. 100-630, § 102, 102 Stat. 3289, 3296 (amending the Education of the Handicapped Act to provide handicapped Native Hawaiian (and other native Pacific basin) children with a free appropriate public education); Business Opportunity and Development Reform Act of 1988, Pub.L. No. 100-656, § 207, 102 Stat. 3853, 3861-62 (amending the Small Business Act by including economically disadvantaged Native Hawaiian organizations as socially and economically disadvantaged small business concerns); Indian Health Care Amendments of 1988, Pub.L. No. 100-713, § 106, 102 Stat. 4784, 4787-88 (amending the Public Health Service Act by creating a Native Hawaiian Health Professions Scholarship program).