**STATE OF ALASKA ex rel. YUKON FLATS SCHOOL DISTRICT, Unalakleet/Neeser Construction JV, Unalakleet Native Corporation, Neeser Construction Company, and Gerald Neeser, Plaintiffs–Appellees,**

v.

**NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT, a/k/a the Native Village of Venetie, the Venetie Tax Court, the Venetie Tax Commission, Gideon James, Lawrence Roberts, Larry Williams, Ernest Erick, Lincoln Tritt, John Titus, and David Case, Defendants–Appellants.**

No. 96–35042.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 7, 1996.

Decided Nov. 20, 1996.

Heather R. Kendall, Native American Rights Fund, Anchorage, AK, for defendants-appellants.

William F. Cummings and D. Rebecca Snow, Assistant Attorneys General, State of Alaska, Juneau, AK, for plaintiffs-appellees.

Lloyd Benton Miller, Sonosky, Chambers, Sachse, Miller & Munson, Anchorage, AK, for amici Native Village of Barrow, et al.

W.D. Bennett, Partnow, Sharrock & Tindall, Anchorage, AK, for amicus Alaska Support Industry Alliance, Inc.

Before: BROWNING, D. W. NELSON, and FERNANDEZ, Circuit Judges.

## OPINION

D. W. NELSON, Circuit Judge:

The Native Village of Venetie Tribal Government appeals the district court's determination that the Alaska Native Claims Settlement Act extinguished Indian country in Alaska, and that the tribal government therefore lacks the authority to impose its Business Activities Tax upon a state contractor. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse the district court's judgment. We conclude that the Alaska Native Claims Settlement Act did not extinguish Indian country in Alaska as a general matter, and that the land Venetie occupies is Indian country.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises from Venetie's attempt to impose its Business Activities Tax upon the Neeser Construction Company, which had been hired by the State of Alaska to build a new school in the village.

The Neets'aii Gwich'in—from whom nearly all of the inhabitants of Venetie descend—are a group of Alaska Natives that has historically inhabited an area consisting of the East Fork of the Chandalar River. In 1940, the Neets'aii Gwich'in adopted a constitution under the Indian Reorganization Act, 25 U.S.C. § 476. This constitution established the Native Village of Venetie as the governing authority of the Neets'aii Gwich'in. In 1943, the Secretary of the Interior created a reservation for the Neets'aii Gwich'in out of approximately 1.8 million acres surrounding Venetie. The Native Village of Venetie has governed this reserve since its creation. In 1976, the Native Village of Venetie restructured its council to include formal representation from Arctic Village (another community comprised of Neets'aii Gwich'in) and changed its name to the Native Village of Venetie Tribal Government ("Venetie").

In 1971, Congress passed the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. § 1601 et seq. ANCSA revoked "the various reserves set aside" for Alaska Natives by legislative or executive action, including the Venetie Reservation. 43 U.S.C. § 1618(a). In exchange, Congress authorized the transfer of $962.5 million and approximately 44 million acres of land to Native village and regional corporations created by the Act. 43 U.S.C. §§ 1606, 1607, 1611. These corporations were to be owned by Native shareholders residing in the corporations' respective geographical areas.

Announcing the goals of the Act, Congress declared that

> the settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation, with maximum participation by Natives in decisions affecting their rights and property, without establishing any permanent racially defined institutions, rights, privileges, or obligations, [and] without creating a reservation system or lengthy wardship or trusteeship....

43 U.S.C. § 1601(b). Congress clarified that ANCSA did not "relieve, replace, or diminish any obligation of the United States or of the State or [sic] Alaska to protect and promote the rights or welfare of Natives...." 43 U.S.C. § 1601(c).

Congress enabled Native village corporations to opt out of ANCSA and to receive title in fee simple to their former reservation lands. 43 U.S.C. § 1618(b). Under this option, "any Village Corporation or Corporations may elect within two years [after the enactment of ANCSA] to acquire title to ... any reserve set aside for the use or benefit of its stockholders or members prior to Decem-

ber 18, 1971." *Id.* Village corporations that exercised this option were not eligible to receive land or monetary distributions from the regional corporation.

Two Native villages were recognized by ANCSA within the boundaries of the former Venetie Reservation and two Native village corporations were thus established for the Neets'aii Gwich'in: one in Venetie (the Venetie Indian Corporation), and one in Arctic Village (the Neets'aii Corporation). In 1973, the shareholders of both corporations elected to opt out of ANCSA and to take title to their former reservation lands. The United States conveyed title to the former Venetie Reservation to the Venetie Indian Corporation and the Neets'aii Corporation as tenants in common.

In 1979, the tribal membership, acting through the Venetie Indian Corporation and the Neets'aii Corporation, transferred title to the former Venetie Reservation to Venetie. The shareholders then voted to dissolve the two Native village corporations. In 1981, the State of Alaska dissolved the corporations for non-payment of fees.

In 1986, Venetie enacted a Business Activities Tax, which imposed a five percent tax on "source gains" derived from commercial activities within the village. That same year, the State of Alaska, through the Yukon Flats School District, entered into a contract with the Neeser Construction Company for the construction of a school within the Native Village of Venetie.

In 1987, Venetie filed suit in the tribal tax court to collect taxes assessed against the Neeser Construction Company in the amount of $161,203.15. The State of Alaska, as the party responsible for paying the tax, refused to defend in tribal court and brought a federal action in the District of Alaska for declaratory and injunctive relief against the Tribe. The state claimed that the Tribe lacked jurisdiction to impose the tax. The district court issued a preliminary injunction enjoining the Tribe from further enforcement proceedings. The Ninth Circuit upheld this ruling. *State of Alaska v. Native Village of Venetie,* 856 F.2d 1384 (9th Cir.1988) *(Venetie I).* The *Venetie I* court held that the Tribe's authority to impose the tax upon non-members

turned on whether Venetie is a federally recognized tribe and, if so, whether it inhabits Indian country. The court articulated a six-part test to guide the district court in its determination of the Indian country question.

On remand, the district court held that although Venetie is a tribe, it does not occupy Indian country as that term is defined by 18 U.S.C. § 1151. Applying its own four-part inquiry, the court determined that while Venetie was a dependent Indian community before 1971, Congress extinguished that status when it passed ANCSA.

Venetie's argument on appeal is in three parts. First, Venetie contends that the district court applied an unduly restrictive standard to determine whether the land at issue is Indian country. Second, Venetie argues that ANCSA did not extinguish Indian country in Alaska. Finally, Venetie asserts that it continues to occupy Indian country and therefore retains its inherent authority to tax activities occurring within its territory.

## STANDARD OF REVIEW

The interpretation of a statute is a question of law reviewed de novo. *Hopi Tribe v. Navajo Tribe,* 46 F.3d 908, 921 (9th Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 337, 133 L.Ed.2d 236 (1995). The district court's factual findings are reviewed for clear error. Fed.R.Civ.P. 52(a); *United States v. American Prod. Indus., Inc.,* 58 F.3d 404, 407 (9th Cir.1995). Accordingly, the district court's determination that Venetie does not occupy Indian country as defined by 18 U.S.C. § 1151(b) is reviewed de novo, but the facts marshalled by the district court to support this determination are reviewed for clear error.

## THE LEGAL STANDARD FOR DETERMINING WHETHER A TRIBE OCCUPIES INDIAN COUNTRY

The ultimate question presented by this case—whether Venetie has the authority to tax activities occurring within its territory— turns on whether Venetie occupies Indian country. *Venetie I,* 856 F.2d at 1390. To resolve this question, we must first establish

the proper standard for determining whether Indian country exists in a given case.

■ Congress has defined Indian country as follows:

"Indian country," as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all *dependent Indian communities* within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151 (emphasis added). This definition applies to both criminal and civil jurisdiction. *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 207 n. 5, 107 S.Ct. 1083, 1087 n. 5, 94 L.Ed.2d 244 (1987). Venetie occupies neither a reservation nor an allotment. Thus, we must establish the test for determining whether a tribe constitutes a dependent Indian community within the meaning of § 1151(b).

■ Although the Supreme Court has never resolved this narrow question, we do not write on a blank slate. A clear body of Court precedent emphasizes two central features of the inquiry into whether a given area constitutes Indian country, as a general matter: first, whether the territory is "validly set apart for the use of the Indians as such," and second, whether the Natives who inhabit it are "under the superintendence of the [federal] Government." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe,* 498 U.S. 505, 511, 111 S.Ct. 905, 910, 112 L.Ed.2d 1112 (1991); *see United States v. John,* 437 U.S. 634, 649, 98 S.Ct. 2541, 2549, 57 L.Ed.2d 489 (1978); *United States v. McGowan,* 302 U.S. 535, 539, 58 S.Ct. 286,

288, 82 L.Ed. 410 (1938); *United States v. Pelican,* 232 U.S. 442, 449, 34 S.Ct. 396, 399, 58 L.Ed. 676 (1914).[1]

Four circuits, including our own, have incorporated these two factors into more detailed approaches to the question of whether a Native group constitutes a dependent Indian community. Drawing upon the Eighth Circuit's decision in *United States v. South Dakota,* 665 F.2d 837 (8th Cir.1981), *cert. denied,* 459 U.S. 823, 103 S.Ct. 52, 74 L.Ed.2d 58 (1982), the First and Tenth Circuits have also adopted a multi-factored test to determine whether a tribe constitutes a dependent Indian community:

[W]hether a particular geographical area is a dependent Indian community depends on a consideration of several factors. These include: (1) whether the United States has retained "title to the lands which it permits the Indians to occupy" and "authority to enact regulations and protective laws respecting this territory,"; (2) "the nature of the area in question, [ (3) ] the relationship of the inhabitants in the area to Indian tribes and to the federal government, and [ (4) ] the established practice of government agencies toward the area,"; ( [5] ) whether there is "an element of cohesiveness ... manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality," and ( [6] ) "whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples."

*Pittsburg & Midway Coal Mining Co. v. Watchman,* 52 F.3d 1531, 1545 (10th Cir. 1995) (quoting *South Dakota,* 665 F.2d at 839 (citations omitted)); *see also Narragansett Indian Tribe of Rhode Island v. Narragansett Elec. Co.,* 89 F.3d 908, 917–22 (1st Cir. 1996). The Second Circuit has endorsed the threefold inquiry originally outlined in *United States v. Martine,* 442 F.2d 1022, 1023 (10th Cir.1971), which consists of the three elements subsumed within the second prong

---

1. The district court noted that "it is not *land* but *Indians* which must be under the superintendence of the federal government." We agree. *Cf. John,* 437 U.S. at 649, 98 S.Ct. at 2549 ("The Mississippi lands in question here were declared by Congress to be held in trust by the Federal

Government for the benefit of the Mississippi Choctaw Indians *who were at that time under federal supervision.*" (emphasis added)). The set-aside requirement adequately ensures that Indian country will not be found absent some federal connection to the land at issue.

of the *South Dakota* test. *See United States v. Cook*, 922 F.2d 1026, 1031 (2d Cir.), *cert. denied*, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991).

Relying upon *South Dakota* and *Martine*, we have suggested that an inquiry into whether a Native group qualifies as a dependent Indian community requires an analysis of six factors:

> (1) the nature of the area; (2) the relationship of the area inhabitants to Indian tribes and the federal government; and, (3) the established practice of government agencies toward that area; .... ([4]) the degree of federal ownership of and control over the area; ([5]) the degree of cohesiveness of the area inhabitants; and ([6]) the extent to which the area was set aside for the use, occupancy, and protection of dependent Indian peoples.

*Venetie I*, 856 F.2d at 1391. The only significant difference between our suggested inquiry and the test adopted by the First, Eighth, and Tenth Circuits is that we assess the "degree of federal ownership and control" over the area in question while the other circuits ask whether the United States retains "title" to the land in question.

In this case, the district court departed from our suggested six-part inquiry and carved out a new test that differs not only from *Venetie I* but from *South Dakota* and *Martine* as well. Relying primarily on *John* and *Potawatomi*, the court determined that the essential factors to be considered when assessing whether a dependent Indian community exists are whether "the Tribal Government holds land set apart for Alaska Natives as such," and whether "the Tribal Government is under the active supervision of the federal government." Indeed, the court concluded that a finding of a dependent Indian community *requires* a showing of these two factors, along with proof that the Native group in question is a tribe.

The court listed two additional factors that could be considered to determine the extent, rather than the existence, of Indian country: "the nature of the area" and "the relationship of the area inhabitants to one another, to Indian tribes, and the federal government." The district court explained that the additional factors set forth in the circuit tests were "somewhat overlapping," and were subsumed in its new test.

■ We agree with the district court in this respect: a federal set aside and federal superintendence are the dominant factors of the dependent Indian community calculus. The most plausible reading of the caselaw supports the district court's approach. Although *John* and *Potawatomi* concerned reservation lands that would now fall under § 1151(a),[2] and *Pelican* concerned allotment land that would now fall within the provisions of § 1151(c), we do not believe that courts should abandon the basic principles that have informed their analysis of Indian country for decades just because they are evaluating the status of an area that does not fit neatly into § 1151(a) or (c). Clearly, the Supreme Court has stressed the importance of an inquiry into whether tribal land was set aside by the federal government and whether the Natives who inhabit it are under the superintendence of the federal government. *See, e.g., Potawatomi*, 498 U.S. at 511, 111 S.Ct. at 910; *John*, 437 U.S. at 649, 98 S.Ct. at 2549. Indeed, in *McGowan*, a case concerning a dependent Indian community that was decided prior to the enactment of § 1151, the Court enunciated precisely these criteria. *McGowan*, 302 U.S. at 539, 58 S.Ct. at 288. Furthermore, numerous lower courts have emphasized these requirements. *See, e.g., Buzzard v. Oklahoma Tax Comm'n*, 992 F.2d 1073, 1076–77 (10th Cir.), *cert. denied*, 510 U.S. 994, 114 S.Ct. 555, 126 L.Ed.2d 456 (1993); *Blatchford v. Sullivan*, 904 F.2d 542, 548–49 (10th Cir.1990), *cert. denied*, 498 U.S.

---

**2.** In both *Potawatomi* and *John*, the Supreme Court concluded that the territories in question were Indian country because they could be viewed as reservations, construed broadly, and not because they were dependent Indian communities. *John*, 437 U.S. at 648 n. .17, 98 S.Ct. at 2548 n. 17 ("Inasmuch as we find in the first category [§ 1151(a)—Reservations] a sufficient basis for the exercise of federal jurisdiction in this case, we need not consider the second and third categories [of § 1151]."); *Potawatomi*, 498 U.S. at 511, 111 S.Ct. at 910 ("As in *John*, we find that this trust land is 'validly set apart' and thus qualifies as a reservation for tribal immunity purposes.").

1035, 111 S.Ct. 699, 112 L.Ed.2d 689 (1991); *Weddell v. Meierhenry*, 636 F.2d 211, 212–13 (8th Cir.1980), *cert. denied*, 451 U.S. 941, 101 S.Ct. 2024, 68 L.Ed.2d 329 (1981); *United States v. Adair*, 913 F.Supp. 1503, 1515 (E.D.Okla.1995); *United States v. Mound*, 477 F.Supp. 156, 160 (D.S.D.1979); *Youngbear v. Brewer*, 415 F.Supp. 807, 809 (N.D.Iowa 1976), *aff'd*, 549 F.2d 74 (8th Cir. 1977).

Although we adopt federal set aside and superintendence as prerequisites to the existence of a dependent Indian community, we believe that these requirements should be construed broadly. This construction accords with the Supreme Court cases upon which § 1151 is based, *see* Reviser's Note, 1948 Act, 18 U.S.C.A. § 1151: *United States v. Sandoval*, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913), and *McGowan*, 302 U.S. at 539, 58 S.Ct. at 288. Both cases eschewed a formalistic assessment of the status of tribal land and adopted a more functional approach to the problem of Indian country that focuses on dependence as the primary consideration. For example, in *Sandoval* the Court held that Congress possessed the power to designate lands held in fee by the Pueblo as Indian country. Congress neither had conferred the lands to the Pueblo, nor held them in trust; rather, they were held in fee under land grants from the King of Spain. Thus, *Sandoval* suggests that the fact that a tribe holds title to land in fee simple, without any restrictions on alienation imposed by the federal government, should not in itself preclude a finding that the land was "set aside" by the government. A per se refusal to construe fee land as Indian country would conflict with *Sandoval*, 231 U.S. at 48, 34 S.Ct. at 6; *see Narragansett*, 89 F.3d at 918. While *Sandoval* is not inconsistent with a general set-aside requirement, it suggests that a set aside can include land held in fee when Congress designates that land as Indian country.

Likewise, federal superintendence should be interpreted broadly. We cannot agree with the district court's requirement that federal superintendence must be "pervasive," meaning that it be the "dominant political institution" in the area as compared to the state. There is no precedent to support narrowing the federal superintendence requirement in this manner. Proof that federal superintendence is "pervasive" has never been required by the Supreme Court. To the contrary, the Court indicated in *John* that unchallenged state jurisdiction and non-continuous federal supervision do not eliminate Indian country. 437 U.S. at 652–53, 98 S.Ct. at 2550–51; *see also Indian Country, U.S.A. v. Oklahoma Tax Comm'n*, 829 F.2d 967, 974 (10th Cir.1987), *cert. denied*, 487 U.S. 1218, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988); *South Dakota*, 665 F.2d at 842 (citing *John*, 437 U.S. at 653, 98 S.Ct. at 2551).

Having determined that a federal set aside and federal superintendence are required elements of a dependent Indian community, and that these requirements should be broadly construed, we must also consider whether the district court erred when it replaced the six-factor inquiry suggested by this court in *Venetie I* with its own four-part test.

The purpose of developing a multi-factored analysis is not to calcify the Indian country inquiry by erecting a complicated set of prerequisites to the establishment of a dependent Indian community. Rather, the multi-factored inquiry suggested by *Venetie I* and modified by the district court is intended to illuminate the "factually dependent" inquiry into whether those requirements have been met. *See Venetie I*, 856 F.2d at 1391. We must guide lower courts as they seek to provide meaning to the general notions of set aside and superintendence. We conclude that the functional approach to Indian country suggested by *Sandoval* and *McGowan* recommends the more textured six-factor inquiry presented by this court in *Venetie I* and adopted by three other circuits, *see Narragansett*, 89 F.3d at 917–22; *Pittsburg*, 52 F.3d at 1545; *South Dakota*, 665 F.2d at 839, over the more restrictive four-prong test advanced by the district court.

Having explained the purpose of the multi-factored inquiry, it is not surprising to find that the factors set forth in our six-part test overlap considerably. For example, the inquiry into the "practice of government agencies toward the area" (third factor in *Venetie I*) may be subsumed within the larger princi-

ple of federal superintendence. And the inquiry into the "degree of federal ownership and control" (fourth factor in *Venetie I*) falls within the set-aside inquiry. Indeed, all six factors listed in the *Venetie I* decision could be construed to fit within the two fundamental elements of a dependent Indian community. Likewise, the two additional factors that the district court chose to leave in place— "the nature of the area" and "the relationship of the area inhabitants to one another, to Indian tribes, and the federal government"— fall under the general rubric of set aside and superintendence, respectively. Because we believe that a functional inquiry into federal set aside and superintendence is better facilitated by a consideration of a wide range of factors, we embrace the six-factor analysis that was suggested in *Venetie I* and which is virtually identical to the approach adopted by three other circuits. *See Narragansett*, 89 F.3d at 917–22; *Pittsburg*, 52 F.3d at 1545; *South Dakota*, 665 F.2d at 839.

■ In sum, we hold that a dependent Indian community requires a showing of federal set aside and federal superintendence. These requirements are to be construed broadly and should be informed in the particular case by a consideration of the following factors:

> (1) the nature of the area; (2) the relationship of the area inhabitants to Indian tribes and the federal government; (3) the established practice of government agencies toward that area; (4) the degree of federal ownership of and control over the area; (5) the degree of cohesiveness of the area inhabitants; and (6) the extent to which the area was set aside for the use, occupancy, and protection of dependent Indian peoples.

## DID ANCSA EXTINGUISH INDIAN COUNTRY IN ALASKA?

We proceed to apply this standard to discern whether the Alaska Native Claims Settlement Act extinguished Indian country in Alaska. Our analysis focuses on federal set aside and federal superintendence because they are the factors that are most relevant to an analysis of the effect of a general statute such as ANCSA. The additional factors that we have adopted above become significant when analyzing whether a specific parcel of land qualifies as Indian country. For example, the cohesiveness of the community and the nature of the area at issue become intelligible factors only once the level of inquiry moves from general statutory provisions to specific territorial claims. Accordingly, the following analysis of ANCSA focuses on set aside and superintendence generally. When we proceed to answer the ultimate question of whether Venetie occupies Indian country, we will illuminate this general inquiry by considering the additional factors of our six-part test.

### A. Canons of Construction

■ We begin by emphasizing the fundamental principle that statutes affecting Indian rights "are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Alaska Pacific Fisheries Co. v. United States*, 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1918); *see also Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250, 1257 (9th Cir.1994); *McNabb v. Bowen*, 829 F.2d 787, 792 (9th Cir.1987). This canon of construction derives from the trust relationship that exists between the federal government and Native Americans. *See Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831). "Since Congress is exercising a trust responsibility when dealing with Indians, courts presume that Congress' intent toward them is benevolent and have developed canons of construction that treaties and other federal action should when possible be read as protecting Indian rights and in a manner favorable to Indians." Felix S. Cohen, *Handbook of Federal Indian Law* 221 (1982 ed.). Among these canons is the rule that Congress's intent to abrogate Indian rights must be indicated by a "clear and plain statement." *See id.* at 224.

■ ANCSA falls into that category of statutes enacted for the benefit of Indians. Therefore, it should be liberally construed, and "doubtful expressions [should be] resolved in favor of the Indians." *Alaska Pacific Fisheries*, 248 U.S. at 89, 39 S.Ct. at 42.

Specifically, congressional intent to extinguish Indian country must be reflected by "clear and plain" language. *United States v. Sante Fe Pac. R.R. Co.*, 314 U.S. 339, 353, 62 S.Ct. 248, 255, 86 L.Ed. 260 (1941). It is with this background principle in mind that we consider the effect of ANCSA.

## B. *Federal Set Aside*

There is no question that Congress set aside land for specific Native entities when it enacted ANCSA. The only question is whether Congress set aside ANCSA land for Alaska Natives, as such. We believe that the village corporations established under ANCSA, while business entities, maintain a distinctly Native identity. Accordingly, we conclude that land set aside for such corporations qualifies as land set aside for Alaska Natives, as such.

The district court determined that the corporate model of Native land ownership established under ANCSA precluded a finding that the federal government had set aside the land at issue for the use of Alaska Natives. The court concluded that the corporate model of land ownership dictated by the Act evinced a congressional intent to treat Alaska Natives as ordinary business entities—not Natives, "as such."

We disagree. First, the corporations established under ANCSA differ markedly from ordinary business corporations. Natives own and manage the corporations. Under the original statute, membership in the corporations was restricted to Natives for 20 years, 43 U.S.C. § 1606(h)(1), and the 1987 Amendments allow each corporation to extend this restriction indefinitely. Alaska Native Claims Settlement Act Amendments of 1987, Pub.L. No. 100–241 (1987) (codified at 43 U.S.C. § 1629c). In addition, the Act provides for each village corporation to be comprised of Natives from a particular Native village, each an existing Native political and cultural entity. 43 U.S.C. § 1607(a). Indeed, under the Act each village corporation gained at a minimum the surface estate to the very land on which the particular

Native village was situated. 43 U.S.C. § 1611(a)(1) (conferring on each local corporation the right to select "all of the township or townships in which any part of the village is located, plus an area that will make the total selection equal to the acreage to which the village is entitled"). Accordingly, the land grants under the Act were far different from mere distributions made to business entities on the basis of monetary value. Rather, they were informed by Natives' historical ties to the lands they inhabit.

Second, the statute suggests that the local corporations are the instruments of, and owe obligations to, the Native villages. The Act defines each village corporation as charged with the responsibility of managing assets "for and on behalf of a Native village...." 43 U.S.C. § 1602(j).

Third, the significant protections of Native land offered by ANCSA and its amendments indicate the extraordinary character of these "business" corporations. Under the original version of the Act, the corporations enjoyed nearly a complete exemption from the requirements of the federal securities laws until 1991, 43 U.S.C. § 1625 (original version of statute), as well as immunity from state and local property taxes on undeveloped land, 43 U.S.C. § 1620 (original version of statute). The 1987 Amendments enabled the corporations to extend the former exemption. Pub.L. No. 100–241 (1987) (codified at 43 U.S.C. § 1625).

The Alaska National Interest Lands Conservation Act ("ANILCA"), Pub.L. No. 96–487 (1980) (codified at 16 U.S.C. §§ 3101–3233, 43 U.S.C. §§ 1606, 1631–41), has provided further protections to Native land. ANILCA permitted Native corporations to place their undeveloped lands in a "land bank," which entitles them to tax benefits, 43 U.S.C. § 1636. Specifically, in exchange for placing a moratorium on development and sale of the "banked" land, and agreeing to manage the land in accordance with federal requirements, the corporations qualify for federal and state property tax immunity. 43 U.S.C. § 1636.[3]

---

**3.** The fact that all private landowners, and not just Native corporations, are eligible for benefits

under ANILCA is not significant. Only private owners of land adjacent to or directly affecting

Finally, the restrictions on Native corporation stock provided by ANCSA indicate the special character of these corporations. At the election of the corporation, its stock may not be alienated, 43 U.S.C. § 1606(h)(1)(B)(vi), and voting rights may be limited to Native stockholders, 43 U.S.C. §§ 1606(h)(2)(C). Even where the corporation elects to lift restrictions on alienation, it may still restrict voting rights to Native stockholders. 43 U.S.C. § 1606(h)(3)(D)(i). Native corporations may also amend their bylaws to give the corporation the right to buy any stock offered for sale by a stockholder, 43 U.S.C. § 1606(h)(3)(D)(ii), and the right of first refusal on any shares transferred to a non-Native pursuant to intestate succession, 43 U.S.C. § 1606(h)(2)(B).

In reaching its conclusion that ANCSA lands were not set aside for Alaska Natives as such, the district court also emphasized ANCSA's provision for Native ownership of land in fee. It is true that in spite of the protections described above, the lands selected by the Natives under ANCSA are freely alienable, unless the Natives elect to seek the shelter of the ANILCA "land bank." But the mere fact that Alaska Natives hold title to the land in fee does not preclude a finding that Congress set aside the lands for their use and occupancy. Refusal to treat a Native group as a dependent Indian community simply because it owned land in fee would conflict with one of the seminal cases on the subject, *Sandoval*, 231 U.S. at 48, 34 S.Ct. at 6. Such a rule would also violate principles articulated by the Supreme Court in another early Indian country case, *United States v. Chavez*, 290 U.S. 357, 364, 54 S.Ct. 217, 220, 78 L.Ed. 360 (1933). There, the Court stated that Indian country includes "*any* unceded lands *owned* or occupied by an Indian nation or tribe." *Id.* (emphasis added).

The Tenth Circuit has considered several cases raising this issue and has concluded that mere. fee ownership does not prevent Native-owned land from qualifying as Indian

country. In *Indian Country, U.S.A.*, 829 F.2d at 973, the Tenth Circuit held that land owned by the Creek Nation is Indian country, even though it is neither on a reservation nor on land held in trust by the federal government. The court concluded that "it would be anomalous to adopt the State's position suggesting that the treaties conferring upon the Creek Nation a title *stronger* than the right of occupancy have left the tribal land base with *less* protection, simply because fee title is not formally held by the United States in trust for the tribe." *Id.* at 975–76. The First Circuit has drawn a similar conclusion. *Narragansett,* 89 F.3d at 918.

These cases suggest that the purpose of the set-aside requirement is to ensure that Native groups do not unilaterally claim rights over Indian country by requiring that Congress at least recognize or designate the land at issue for Native use. On these grounds, the argument that the government set aside the land is stronger in this case than it is in either *Sandoval* or *Martine,* where the Tribes acquired fee title from entities other than the government. Here, Congress specifically has conferred the land at issue on the Natives by statute. We hold that this satisfies the set-aside requirement.

## C. *Federal Superintendence*

The superintendence requirement of the dependent Indian community test is designed to determine the extent to which the traditional trust relationship between the federal government and Native Americans remains intact in a particular case. There is no hard and fast rule for determining how involved the trust relationship must be to constitute the requisite level of superintendence.

■■■ Before the passage of ANCSA, Alaska Natives were thought to be under the guardianship of the United States and were entitled to the benefits of this special relationship. *See Alaska Pacific Fisheries Co.,* 248 U.S. at 88, 39 S.Ct. at 41; *Pence v.*

---

federal or state lands ·are eligible. 43 U.S.C. § 1636(a)(1). Even more important, Native corporations receive greater benefits than other landowners—only Native corporations are entitled to tax immunity, 43 U.S.C. § 1636(c)(2). These protections not only evince a congressional

intent to preserve a protective relationship with Alaska Natives, one which continues a policy of federal superintendence, *see infra,* but they also suggest that Congress meant to "set aside" the land specifically for the use of Natives, as such.

*Kleppe,* 529 F.2d 135, 138 n. 5 (9th Cir.1976); Cohen, *supra,* at 739. We believe that this trust relationship survived the passage of ANCSA. This circuit "appears to recognize a federal trust responsibility comparable to that toward other Indians, even after passage of the Alaska Native Claims Settlement Act." William Canby, *American Indian Law* 274–75 (2d ed. 1988) (citing *Alaska Chapter, Associated General Contractors v. Pierce,* 694 F.2d 1162, 1168–69 n. 10 (9th Cir.1982)).

The district court found that ANCSA "effected a significant change in relationship as between the federal government and Alaska Natives." The court emphasized that the corporate model introduced by ANCSA constituted "a significant diminution of the power of Congress and the Executive agencies over Alaska Native tribes," and that Congress's policy in enacting ANCSA "strongly suggests a shift from government superintendence to self regulation." The district court concluded that "[t]he federal government no longer exercises that level of *active* superintendence necessary to evidence an intent to be the *dominant* political institution in the area in question to the exclusion of the state."

As a threshold matter, we reject the notion that federal supervision must be "dominant" in order to satisfy the superintendence prong of the Indian country test. This "dominant" standard appears to have been determinative in the district court: the court relied on the introduction of state control over Native corporations to support its conclusion that federal superintendence had been displaced by ANCSA. But the introduction of state supervision over certain aspects of Indian life does not eviscerate Indian country. "[A]t times Congress has retained Indian country status but has delegated partial jurisdiction to states over areas of Indian country or over specific legal subjects." Cohen, *supra,* at 361. An example of such congressional action is Public Law 280, which grants certain states extensive criminal and civil jurisdiction over Indian country. *See* 18 U.S.C § 1162 (criminal jurisdiction); 28 U.S.C. § 1360 (civil jurisdiction). Although this law "radically shifts the balance of jurisdictional power to-

ward the states and away from the federal government .... [it does not] terminate the trust relationship between the tribes and the federal government." Canby, *supra,* at 176. Courts have determined that tribal jurisdiction—and thus Indian country—exists in states to which Public Law 280 applies. *See Bryan v. Itasca County,* 426 U.S. 373, 388–89, 96 S.Ct. 2102, 2110–11, 48 L.Ed.2d 710 (1976); *see also* David Case, *Alaska Natives and American Laws* 439 (1984) ("[E]ven P.L. 280 does not deprive a tribe of continuing (although concurrent) tribal jurisdiction"). This analysis indicates that the litmus test of federal superintendence is whether the federal government has abandoned its trust responsibilities, rather than whether the state government has been injected into tribal affairs.

Any law terminating the federal trust relationship with a Native tribe or organization must do so clearly and explicitly. Cohen, *supra,* at 224. ANCSA contains no such statement; in fact, it is clear that it did not extinguish federal superintendence of Alaska Natives. Therefore, the federal government continues to execute its trust responsibilities toward Alaska Natives.

First, the plain language and legislative history of the statute evince Congress's intent to maintain federal superintendence over Alaska Natives. While the Act promotes Native autonomy and disavows any "lengthy wardship or trusteeship," 43 U.S.C. § 1601(b), Congress declared that ANCSA did not "relieve, replace, or diminish any obligation of the United States or of the State or [sic] Alaska to protect and promote the rights or welfare of Natives...." 43 U.S.C. § 1601(c). Additionally, Congress rejected an earlier version of the bill that would have transferred federal responsibilities for Alaska Natives to state authorities. *See* Alaska Native Claims Settlement Act of 1970, S. 1830, 91st Cong., 2d Sess. at § 4(b)(1) (1970).

Second, ANCSA neither prohibits nor discontinues the provision of federal services to Alaska Natives. Payments made under the Act do not "substitute for any governmental programs otherwise available to the Native people of Alaska...." 43 U.S.C. § 1626(a).

Indeed, Alaska Natives remain eligible for federal benefit programs after ANCSA:

> ANCSA did not end federal benefits and protections for Alaska Natives; it concerned only their lands and land-related claims. Natives in Alaska continue to be eligible for and receive assistance under federal programs available to Indians throughout the United States. All major Indian legislation since ANCSA specifically has included Alaska Natives or their villages or corporations.

Cohen, *supra*, at 766. Examples of such major legislation include the Indian Self–Determination and Education Assistance Act, 25 U.S.C. § 450b(e), the Indian Health Care Improvement Act, 25 U.S.C. §§ 1603(c)–1603(d), the Tribally Controlled Community College Assistance Act, 25 U.S.C. § 1801(2), and the Indian Child Welfare Act, 25 U.S.C. §§ 1903(3), 1903(8).[4] Taken together, this patchwork of benefit programs demonstrates a continuing intent by Congress to maintain federal superintendence over Alaska Natives.

Third, the fact that ANCSA transferred title to settlement lands to corporate entities does not appear to have extinguished federal superintendence over Alaska Natives. The House Report accompanying ANCSA suggests that the Act significantly diminishes federal supervision over Native corporations: "The regional corporations and the village corporations will be organized under State law, and will not be subject to Federal supervision except to the limited extent specifically provided in the bill." H.R.Rep. No. 523, 92d Cong., 1st Sess., *reprinted in* 1971

U.S.C.C.A.N. 2192, 2199. However, subsequent legislative action belies this intention and indicates that Congress continues to exercise federal superintendence over Native corporations. "Since the enactment of ANCSA, Congress has not excluded Alaska Natives from any programs available to other Native Americans and, indeed, specifically has included Alaska Natives, villages, *and corporations* among those eligible for programs under all new major Indian legislation." Cohen, *supra*, at 769 (emphasis added).

Furthermore, the Native corporations themselves are subject to federal controls that have not been imposed upon the general corporate community. Corporate articles and stock ownership are regulated by the federal government. *See, e.g.,* 43 U.S.C. § 1606(e) (requiring that Secretary of Interior must approve Native corporations' articles of incorporation and bylaws and that such articles and bylaws may not be amended for five years without Secretary's approval); 43 U.S.C. § 1606(h)(1)(B) (providing that stock in Native corporations is inalienable at corporations' election); 43 U.S.C. § 1606(h)(2)(C) (providing that only Natives may own voting shares of stock); 43 U.S.C. § 1606(h)(2)(B) (granting Native regional corporations right of first refusal to shares transferred to a non-Native pursuant to intestate succession); 43 U.S.C. § 1606(h)(3)(D)(i) (corporation may amend its bylaws to give corporation the right to buy any stock offered for sale by a stockholder). Additionally, Native corporations may place their land in a "land bank,"

---

**4.** The State of Alaska has identified four acts of Congress that do not specifically define Alaska Native corporations as "Indians" or ANCSA land as "Indian land." In fact, only the Indian Gaming Regulation Act, 25 U.S.C. § 2701 et seq., defines "Indian lands" in a way that may not encompass ANCSA lands, *see* 25 U.S.C. § 2703(4)(B), and only the Indian Land Consolidation Act, 25 U.S.C. § 2201 et seq., defines "tribe" in a way that may not include Alaska Native corporations, *see* 25 U.S.C. § 2201(1). The Indian Law Enforcement Reform Act, 25 U.S.C. § 2801 et seq., adopts the definition of "Indian country" set forth in 18 U.S.C. § 1151—the very statute that we interpret today to contemplate Alaska Natives as dependent Indian communities. *See* 25 U.S.C. § 2801(4). The only other statute to which the State of Alaska

cites can be read to *support* the notion that Congress continues to exercise superintendence over Alaska Natives. The National Indian Forest Resources Management Act, 25 U.S.C. § 3101 et seq., establishes an Alaska Native technical assistance program designed to promote the sustained yield management of Indian forest services. *See* 25 U.S.C. § 3112(a). The federal government provides this support directly to ANCSA corporations, implicitly recognizing the essentially Native character of such corporations.

Even if we were to read these four statutes as suggesting a disconnect between ANCSA corporations and Alaska Natives, we are not persuaded that they overcome the evidence of continuing federal superintendence over Alaska Natives that is contained in the major legislative initiatives affecting Indians.

which entitles the corporation to various tax benefits. 43 U.S.C. § 1636.

Congress did provide Native corporations with the power to opt out of these supervisory controls, see 43 U.S.C. § 1629c(b) (alienability restrictions continue in perpetuity unless rescinded by Native corporation), and the decision to place land in a "land bank" is at the corporations' discretion. 43 U.S.C. § 1636. But these provisions do not indicate a clear congressional intent to *terminate* federal superintendence over Native corporations. Instead, when viewed in conjunction with the federal assistance provided to the members of these corporations, these provisions at most reflect the general ambiguity of ANCSA's effect on claims of Indian country in Alaska. This ambiguity has been recognized by Congress: "No provision of this Act (the Alaska Native Claims Settlement Act Amendments of 1987) . . . or change made by . . . this Act in the status of land shall be construed to validate or invalidate or in any way affect . . . any assertion that Indian country . . . exists or does not exist within the boundaries of the State of Alaska." Pub.L. No. 100–241 § 17(a)(2) (1988), 101 Stat. 1814. Because statutes affecting Indian rights "are to be liberally construed, doubtful expressions being resolved in favor of the Indians," *Alaska Pacific Fisheries,* 248 U.S. at 89, 39 S.Ct. at 42, we conclude that the transfer of title to Native corporations—and not to tribes—does not extinguish federal superintendence over the Alaska Natives who comprise those corporations.

Perhaps the strongest objection to this conclusion is that ANCSA appears to implement, in no uncertain terms, a policy of Native self-determination that is fundamentally at odds with the paternalistic echoes of the trust relationship. As noted above, ANCSA promotes Native autonomy and disavows any "lengthy wardship or trusteeship." 43 U.S.C. § 1601(b). How can this intent be reconciled with a continuing design to exercise federal superintendence over Alaska Natives?

The answer is found in the unique relationship that Native Americans share with the federal government. On July 8, 1970, President Nixon enunciated a federal policy toward Indians that continues to this day: self-determination without termination of the trust relationship. The President "called for rejection of the extremes of termination and paternalism: termination because it ignored the moral and legal obligations involved in the special relationship between tribes and the federal government, and paternalism because it resulted in 'the erosion of Indian initiative and morale.'" Cohen, *supra,* at 186 (quoting Richard M. Nixon, *Special Message to the Congress on Indian Affairs* (July 8, 1970)). The reconciliation of self-determination and superintendence is reflected in the Indian Self–Determination and Education Assistance Act of 1975, where Congress declared its commitment

> to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.

25 U.S.C. § 450a(b). The federal government is fulfilling, not abandoning, its trust responsibilities when it facilitates Indian self-determination. Moreover, as expressed by the Self–Determination Act, Indian self-determination involves increased participation of Native Americans in the administration of federal programs, not the elimination of those programs nor the removal of federal officials from a supervisory role over those programs.

We believe that ANCSA also implemented the federal policy of self-determination without termination of the trust relationship. Accordingly, we find that Native self-determination and ongoing federal superintendence may coexist, and that this is precisely the federal-tribal relationship that was introduced by ANCSA.

In sum, we hold that ANCSA neither eliminated a federal set aside for Alaska Natives, as such, nor terminated federal superinten-

dence over Alaska Natives. As a result, Indian country still may exist in Alaska.

## DOES VENETIE OCCUPY INDIAN COUNTRY?

Having determined that ANCSA does not extinguish Indian country in Alaska, we must ask: Is Venetie a dependent Indian community? The district court found that prior to ANCSA, the Venetie Reservation had been set aside for the Neets'aii Gwich'in as Alaska Natives, and its inhabitants were subject to the active superintendence of the federal government. Its conclusion that Venetie no longer constitutes a dependent Indian community rests on the changes effected by ANCSA.

 We have determined that ANCSA does not extinguish Indian country in Alaska as a general matter. This conclusion changes the import of the district court's factual findings; when we accord a broad interpretation to set aside and superintendence, the district court's factual findings actually support the determination that the land owned by Venetie is Indian country. We proceed to illustrate this point by examining the relevant factors of our six-pronged inquiry, mindful of the overarching prerequisites to a dependent Indian community—set aside and superintendence.[5]

### A. The Nature of the Area

Venetie owns the former Venetie Reservation, an area of 1.8 million acres that is the heart of the land traditionally used by the Neets'aii Gwich'in. This land is isolated and undeveloped; it is not accessible by surface roads or railroads. We accept the district court's conclusion that "the Neets'aii Gwich'in have, since before the appearance of non-natives, inhabited a reasonably well-defined territory to the virtual exclusion of other people; and in modern times have occupied much of that same territory, in the form of the Venetie Reservation. They still occupy this same land."[6] The district court also found that the land owned by Venetie is well suited to the Tribe's subsistence lifestyle. These determinations support the conclusion that Venetie has a special "use and occupancy" relationship to the land at issue.

### B. The Relationship of the Area Inhabitants to Indian Tribes and the Federal Government

Venetie is home to the Neets'aii Gwich'in, and its inhabitants are, almost exclusively, members of that Tribe. The near-perfect correlation between area inhabitants and tribal membership indicates the strong ties between the land, its people, and the Tribe.

The area inhabitants are similarly bound to the federal government. Venetie has enjoyed a long history of interaction with federal officials. Since the early part of this century, the Bureau of Indian Affairs has been involved in the administration of educational and health services in Venetie. The BIA operated a school at Arctic Village until 1970 and at Venetie until 1984. Venetie obtained one of the first approved constitutions under the Indian Reorganization Act. The district court acknowledged that the inhabitants of Venetie maintain "significant contacts and relationships" with numerous federal agencies. And as the district court recognized, the fact that the Tribe has established ties to the State of Alaska "is not inconsistent with a finding of Indian Country if all of the elements of such are proven." *See John,* 437 U.S. at 652 n. 23, 98 S.Ct. at 2550 n. 23 ("[T]he provision of state services to Indians would not prove that the Federal Government ha[s] relinquished its ability to provide for these Indians under its Article I power.").

---

5. The factual predicate for the following discussion is drawn from the district court's tribal status and Indian country opinions in this case. The district court's factual findings are not clearly erroneous, and we accept them without objection. Our difference with the district court concerns the legal significance of these factual findings.

6. This conclusion is contained in the district court's tribal status decision in the Venetie case, in which the court held that Venetie qualifies as an Indian tribe. This holding is not challenged on appeal.

## C. The Established Practice of Government Agencies Toward the Area

Despite the longstanding relationship between Venetie and the federal government and the continuing interaction between the Tribe and federal agencies, the district court found that the federal government's role in providing various services to the area had diminished in two principal respects. First, "federal largess is now available in the form of grants and other programs which are administered by Native people themselves with general oversight by agencies as opposed to direct agency services to the tribe." Second, the State of Alaska has played a more pervasive role in providing these services.

Undoubtedly, the practice of federal agencies toward Venetie has changed since ANCSA was enacted in 1971. In many respects, the federal government has been replaced by either the State or the Tribe itself as the direct provider of services. If the litmus test of federal superintendence was that such superintendence be "pervasive," meaning that it be the "dominant political institution" in the area as compared to the state, the diminished federal role would undermine the conclusion that federal superintendence over Venetie continues today. But "dominance" is not the proper benchmark of superintendence. As explained *supra*, the litmus test of federal superintendence is whether the federal government has abandoned its trust responsibilities, not whether the state government has been injected into tribal affairs.

On the record before us, it is clear that the federal government continues to be involved in the affairs of the Neets'aii Gwich'in. For example, as noted by the district court, "[f]ederal grants have been approved for an airport at Arctic Village, a 29–unit housing project at Venetie, water and wastewater systems at Arctic Village and Venetie, housing renovation at Venetie, and a self-governance project. There were other similar federal grants as well." This supports a finding that Venetie has met the federal superintendence requirement of the dependent Indian community test.

## D. The Degree of Federal Ownership of and Control over the Area

ANCSA terminated federal ownership of the Venetie Reservation. Today, Venetie owns its land in fee simple, and the federal government exercises few controls (if any) over Venetie's territory. As noted above, however, tribal ownership of land in fee does not defeat a finding of Indian country. *Cf. Sandoval*, 231 U.S. at 48, 34 S.Ct. at 6; *Narragansett*, 89 F.3d at 918. It does mean that the Tribe must produce alternative evidence of federal superintendence over Native affairs in the territory. Based on our findings in subsections B and C, *supra*, we conclude that the Tribe has met this burden.

## E. The Degree of Cohesiveness of the Area Inhabitants

The high degree of cohesiveness among the inhabitants of Venetie is uncontested. We have no reason to depart from the district court's finding that

> the Neets'aii Gwich'in are a cohesive community. All but a few residents of the area (notably school teachers) are Alaska Natives and members of the tribe. They have at all times relevant to this case, right down to the present, voluntarily come together for purposes of forming their own traditional councils which have provided for the protection and welfare of the whole community.

## F. The Extent to Which the Area Was Set Aside for the Use, Occupancy, and Protection of Dependent Indian Peoples

The district court correctly acknowledged that when the Neets'aii Gwich'in obtained a reservation in 1943, "this land was set aside for [them] as a Native people." The district court concluded, however, that the land at issue is no longer set aside for the use and occupancy of Alaska Natives, as such. This conclusion was based upon ANCSA's extinguishment of the Venetie Reservation and the Act's transfer of land not to the Neets'aii Gwich'in Tribe but to a corporate entity. As indicated in our general discussion of ANCSA's impact upon the federal set aside requirement, *supra*, we disagree with this conclusion. We believe that the

village corporations established under ANC-SA, while business entities, maintain a distinctly Native identity. Accordingly, we conclude that land set aside for such corporations qualifies as land set aside for the use, occupancy, and protection of Alaska Natives, as such.

Venetie presents an especially compelling illustration of this conclusion. Section 1618(b) of ANCSA permits a village corporation to acquire title to "any reserve set aside for the use or benefit of its stockholders or members prior to December 18, 1971." In exchange, the village corporation forfeits any claim to land or funds distributed by the regional corporation under ANCSA. When the members of the Venetie and Arctic Village corporations voted to exercise their rights under § 1618(b), they received a parcel of land that mapped the former reservation of their common Tribe—the Neets'aii Gwich'in. Title to this former reserve was subsequently transferred to Venetie, effecting the result made possible by § 1618(b): reunification of the Tribe and its reserve land.

We believe that this result strengthens the conclusion that a federal set aside for the use and occupancy of the Neets'aii Gwich'in, as such, has been maintained. Section 1618(b) may use the general corporate form of ANCSA, but its underlying purpose is to permit Alaska Natives to retain the historic connection between tribes and their lands. Corporations may be the vehicle through which this goal is accomplished under § 1618(b), but this section defines eligible land according to the pre-ANCSA claims of corporation *members*. The reunification of Venetie with its former reservation land demonstrates that the land has been set aside for Indians, *as such*—an assertion that is somewhat less straightforward where Native corporation land does not share such a close association with former tribal land.

The foregoing application of our six-factor inquiry indicates that Venetie meets the set-aside and superintendence requirements of the dependent Indian community test. Although the federal government no longer owns or controls the former Venetie Reservation, every other factor of our inquiry supports the conclusion that Venetie occupies Indian country: Venetie has a special "use and occupancy" relationship to its land; the inhabitants of Venetie maintain "significant contacts and relationships" with numerous federal agencies; the federal government continues to be involved in the affairs of the Neets'aii Gwich'in; the high degree of cohesiveness among its inhabitants indicates that Venetie is a strong and distinct Native community; and the reunification of Venetie with its former reservation land via a statutory mechanism provided by Congress demonstrates that the land has been set aside for Indians, *as such*. We therefore conclude that Venetie is a dependent Indian community and that, accordingly, its territory qualifies as Indian country.

## CONCLUSION

██ This nation has a special relationship with and responsibility toward Native American citizens. The Alaska Native Claims Settlement Act is a unique and innovative attempt to meet that responsibility. It marks a genuine endeavor to facilitate Native self-determination by providing for the direct involvement of Alaska Natives in the management of their affairs. This policy of self-determination fulfills the special relationship between Alaska Natives and the federal government; it does not terminate that relationship. Absent a clear and unequivocal expression by Congress, we will not imply that such termination has occurred.

ANCSA does not contain a definitive statement expressing its effect upon Indian country in Alaska. In fact, various elements of ANCSA indicate that a federal set aside was conveyed by the Act and that federal superintendence of Alaska Natives was preserved under the Act. Accordingly, we hold that ANCSA did not extinguish Indian country in Alaska, and that Venetie, having demonstrated that it qualifies as a dependent Indian community, occupies its territory as Indian country.

The judgment of the district court is REVERSED and this case is REMANDED to the district court to determine whether Venetie has the power to impose a tax upon a

private party where the State of Alaska will ultimately pay the obligation.[7]

FERNANDEZ, Circuit Judge, concurring:

Because judges are historically minded and experts at analogical reasoning, it is very tempting to treat ANCSA as just another statute to be adjudged as if it were a mere continuation of prior Indian policy. A continuation, that is, if that policy can really be called continuous. But ANCSA was intended to be and was something very different. It attempted to preserve Indian tribes, but simultaneously attempted to sever them from the land; it attempted to leave them as sovereign entities for some purposes, but as sovereigns without territorial reach. Thus, the land and the vast sums of money made available did not go to the tribes. It went into mere private corporations.

Those corporations were to be separate from the tribes, could sell land, and could even be taxable eventually, although the land could also be placed in tax-free preserves, just as anyone else's land can be under proper circumstances. The tribes were no longer land based; they were member based. In short, Congress wanted to provide for "maximum participation by Natives in decisions affecting their rights and property, without establishing any permanent racially defined institutions, rights, privileges, or obligations, without creating a reservation system or lengthy wardship or trusteeship, and without adding to the categories of property and institutions enjoying special tax privileges ..." in Alaska. 43 U.S.C. § 1601(b). The tribes would continue as sovereigns, but there would be no more Indian country because the land would not be set aside by the United States "for the use of the Indians as such." *United States v. Pelican,* 232 U.S. 442, 449, 34 S.Ct. 396, 399, 58 L.Ed. 676 (1914). Nor would it remain "under the superintendence of the government." *Id.; see also Op. Sol. Gen. of Dep't of Interior,* M–36975, 131–33 (Jan. 11, 1993).

Let me put it a slightly different way. The reason that the old Indian country test will not work is that Congress's new conception was to maintain tribal sovereignty and to maintain a federal interest in and protection of Indians and tribes, but to separate the land, and an almost billion-dollar fund, from the tribes themselves. That left a potent resource in the hands of the Indian peoples. It also left tribal sovereignty intact, but it simultaneously precluded that sovereignty from being reified in the form of control over land.

In so doing, Congress disassociated the land from all other claims, including Indian country claims. It did so explicitly when it extinguished all claims "based on claims of aboriginal right, title, use, or occupancy of land ... or ... based on any statute or treaty...." 43 U.S.C. § 1603(c). The very idea of Indian country is, of course, a notion incorporated into a statute. *See* 43 U.S.C. § 1151. Moreover, the assertion of § 1151 sovereignty over territory is a claim which is necessarily based upon aboriginal title, statute, or treaty. Both were abolished. As we have previously recognized, the provenance of ANCSA was unique, so even the old rule of construction of statutes in favor of Indians "operates with less force." *United States v. Atlantic Richfield Co.,* 612 F.2d 1132, 1139 (9th Cir.1980). That uniqueness is why the old tests just do not work.

Of course, the land deeded to the private corporations was for the benefit of their Indian stockholders, just as the money was for their benefit. Of course, those same Indian stockholders tended to be members of tribes, though they did not need to be. Of course, the government retained its interest in the tribes, as such, and in the Indian peoples themselves. Perhaps not every group could show cohesiveness, but it certainly is true that the land was set aside for Indian peoples *ab initio,* although in no sense was most of it for their exclusive use, occupancy, or protec-

---

**7.** In *Venetie I,* Venetie argued that sovereign immunity shielded it from suit and that, in the alternative, the tribal abstention doctrine precluded the federal court from hearing Alaska's claim until it was adjudicated in tribal court. The *Venetie I* court declined to reach either argument on the ground that both contentions de-pended upon a preliminary finding that Venetie was a tribe.

On remand, the district court held that Venetie is in fact a tribe. However, Venetie asserts neither sovereign immunity nor the tribal abstention doctrine on this appeal.

tion any more than land owned by any other corporate entity is for the use, occupancy, or protection of its members. But all of that is really rather irrelevant under the new regime. If ANCSA meant anything at all, it meant that the tribes, as such, would no longer have control or sovereign power over the land. They would only have sovereignty over their members. As far as the land was concerned, the regular state and federal political entities would have and retain the necessary power. In short, it was no longer necessary to explicate and mull over previous Indian country concepts. That was the promise of the new era. When Congress did all of that, it created something rather different, rather unique, rather simple, and yet rather daedalian.

We have been asked to confuse matters by applying out-of-date theories to a truly new concept of Indian relationships and sovereignty. We have been asked to blow up a blizzard of litigation throughout the State of Alaska as each and every tribe seeks to test the limits of its power over what it deems to be its Indian country. There are hundreds of tribes, and the litigation permutations are as vast as the capacity of fine human minds can make them. They can include claims to freedom from state taxation and regulation, claims to regulate and tax for tribal purposes, assertions of sovereignty over vast areas of Alaska, and even assertions that tribes can regulate and tax the various corporations created to hold ANCSA land. The latter assertion would give the tribes the power to control, regulate, and tax those corporations out of existence and would provide a fruitful area for intertribal conflict. This is no imaginative parade of horribles. In the cases before us today, one tribe, Kluti Kaah, seeks sovereignty over an area as unlike Indian country as one could imagine. The other seeks sovereignty, and has been made sovereign, over a piece of the State of Alaska about as large as the State of Delaware. Furthermore, both Kluti Kaah and Venetie assured us at argument that tribes, as they see it, do have the power to tax and regulate the myriad of private corporations which received land under ANCSA.

1. Of course, I recognize that there is an exception. One reservation was preserved. *See* 43

Were we writing on a clean slate, I would eschew the tribe's request and would avoid creating the kind of chaos that the 92nd Congress wisely sought to avoid. Alas, it is too late because we have already taken the position that ANCSA did not eliminate Indian country in Alaska. We have directed that decisions be made on a case-by-case basis. *See State of Alaska v. Native Village of Venetie*, 856 F.2d 1384, 1390–91 (9th Cir. 1988) (*Venetie I*); *cf. Native Village of Tyonek v. Puckett*, 957 F.2d 631, 634 (9th Cir. 1992). It is unfortunate that what could have been a tessellation is to be a crazy quilt instead. But if we are to have that quilt, I agree that Venetie's territory is Indian country, if any still exists in Alaska.[1] Needless to say, I do not embrace that result with the gusto shown by the majority, and I do not accept all of the majority's reasoning.

Nevertheless, under the compulsion of our cases, I concur in the result.